IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

LAWRENCE W. BURCH, II,

                       Petitioner,

    -vs-

CHRIST T. MILLAS, Superintendent,
Watertown Correctional Facility,

                    Respondent.
_____

**DECISION AND ORDER**
**No. 03-CV-0387(VEB)**

## I.     Introduction

Lawrence W. Burch, II ("Burch" or "petitioner"), represented by attorney Charles

Edward Fagan, Esq. ("Attorney Fagan" or "habeas counsel"), brought this petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Chautauqua County

Court on one charge of aggravated sexual abuse in the second degree. The parties have

consented to final disposition of this matter by a magistrate judge pursuant to 28 U.S.C. §

636(c)(1).

## II.     Jurisdiction

### A.     "In Custody" Requirement

Under 28 U.S.C. § 2254, a habeas petitioner must establish that he is "in custody in

violation of the Constitution or laws ... of the United States." See 28 U.S.C. § 2254(a). However,

a petitioner need not actually be imprisoned to meet the "in custody" requirement, and may

satisfy this requirement if he presently suffers from substantial restraints not shared by the public

generally. *See*, *e.g.*, *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973) (release on own

recognizance); *Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (parole). Moreover, once the petitioner has satisfied the "in custody" requirement, jurisdiction is not thereafter defeated by petitioner's subsequent release from custody. *See Carafas v. LaVallee*, 391 U.S. 234, 238 (1968). Burch was sentenced to an indeterminate term of four to eight years in prison. Burch served his sentence at Mt. McGregor Correctional Facility and was released during the pendency of the instant federal habeas corpus proceeding. Because he filed his petition while he was incarcerated, he has satisfied the "in custody" requirement of 28 U.S.C. § 2254(a). *See Maleng v. Cook*, 490 U.S. 488, 109 S. Ct. 1923, 1925-26 (1989).

### B. Mootness

As with all litigants in federal court, a habeas petitioner must satisfy the case or controversy requirement of Article III, § 2, of the Constitution in order to be eligible for relief. A case becomes moot if, at any stage of the proceedings, it fails to satisfy the case-or-controversy requirement. *Kamagate v. Ashcroft*, 385 F.3d 144, 150 (2d Cir. 2004) (citing *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)); *accord Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 51 (2d Cir.2004); *Swaby v. Ashcroft*, 357 F.3d 156, 159-60 (2d Cir.2004). Burch's petition was not rendered moot by his subsequent release from custody. However, in order for a habeas petitioner who is no longer in custody to demonstrate a live case or controversy, there must exist a concrete and continuing injury which is a collateral consequence of the detention and which can be remedied by granting the writ. *See Spencer*, 523 U.S. at 7; *see also Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir.2002).

A prisoner's challenge to the validity of his conviction always satisfies the "case or controversy" requirement of Article III because the incarceration constitutes a concrete injury,

caused by the conviction and redressable by invalidation of the conviction. *Spencer v. Kemna*, 523 U.S. at 7. However, when the prisoner's sentence has expired, some concrete and continuing injury other than the now-ended incarceration–that is, some "collateral consequence" of the conviction– must exist if petition is to remain justiciable. *Id.* (citing *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968)). The Supreme Court has held that collateral consequences are presumed to flow from a felony conviction such as the one at issue here, such that petitioner's release from custody does not moot the habeas petition. *Sibron v. New York*, 392 U.S. 40, 55-56 (1968); *Evitts v. Lucey*, 469 U.S. 387, 391 n.4 (1985); *accord Spencer*, 523 U.S. at 8, 12 (not departing from *Sibron*'s presumption that "a wrongful criminal conviction has continuing collateral consequences (or, what is effectively the same, to count collateral consequences that are remote and unlikely to occur)," but declining to extend the *Sibron* to the parole revocation context).

Here, Burch challenges the underlying felony conviction that led to his detention, and the *Sibron* presumption of collateral consequences exists. *See Spencer*, 523 U.S. at 7-8 (citing *Sibron*, 392 U.S. at 55-56). Accordingly, Burch's habeas petition has not been mooted by his release from incarceration in state custody and presents a justiciable controversy amenable to review by this Court.

## III.    Factual Background and Procedural History

### A.    Indictment and Trial Proceedings (First and Second Trials)

On June 11, 1997, Burch was indicted by a Chautauqua County Grand Jury on one count of aggravated sexual abuse in the second degree (N.Y. Penal Law § 130.67(1)(a)), a class C

felony. The indictment alleged that "on or about February, 1997,"[1] Burch "did insert a finger in the vagina of another person causing physical injury to such person by forcible compulsion." The alleged victim was the eleven-year-old daughter ("the complainant") of Burch's girlfriend, A.B., with whom he was living at the time.

At the trial-court level, Burch was assigned an attorney from the Chautauqua County Public Defender's Office, Donald V. Nihoul, Esq. ("Attorney Nihoul" or "trial counsel"). Burch's first jury trial in Chautauqua County Court (Ward, J.) ended in a mistrial because the jury was unable to reach a unanimous verdict. *See* Affidavit of Charles Edward Fagan, Esq., Submitted In Support of Habeas Petition ("Fagan Habeas Aff.") ¶6 (stating that in certain state court pleadings, the prosecutor noted that, upon information and belief, the vote was eight to four in favor of acquittal.); *see also* Petitioner's Memorandum of Law in Support of Habeas Petition ("Pet'r Habeas Mem.") at 1; People's Brief on Direct Appeal ("Peo. App. Br.").[2]

Jury selection for petitioner's second trial was scheduled for early April of 1998. Another mistrial was declared, this time because counsel ran out of prospective jurors before a full jury could be seated. *Id.*

### B.    Trial Proceedings – Petitioner's Third Trial

Burch's third jury trial commenced on April 28, 1998, in Chautauqua County Court before Acting County Court Judge Robert C. Noonan. Burch again was represented by Attorney Nihoul. In his opening statement on April 29, 1998, trial counsel set forth the defense theory of

---

[1]    A more specific date was not given in the indictment.

[2]    Fagan indicates that he was retained by Burch's family and friends to perfect Burch's direct appeal and to file collateral motions to vacate the judgment "after it was discovered that no pre-trial discovery demands had been made by Mr. Nihoul, and no motions were submitted by [the] Defense in preparation for trial." Fagan Aff., ¶10.

the case–namely, that the victim was upset about her mother's new relationship with Burch and wanted "unfettered access to her mom and her mom's attention[.]" T.196.[3] Trial counsel told the jury that "for about six months prior to this alleged incident [the victim] had become increasingly rebellious, defiant, and had just got to the point where she could hardly tell the truth about anything." T.195. According to the defense, the victim "threatened her parents at least on two occasions with being reported to Child Protection." T.195-96. The victim was portrayed as having "a grudge against Mr. Burch and . . . wanted him out of the house;" *id.*; hence, the victim concocted the story about Burch sexually abusing her in order to oust him from the household and her mother's life. As the trial judge would later observe, the "issue of credibility" was "critical to the case . . . ." T.332.

### 1.    The Prosecution's Case

#### a.    The Complainant

The complainant testified that Burch had lived with her and her mother, along with her half-brother and half-sister for "[m]aybe three or four years" prior to the incident in 1997, and that she called Burch her "dad." *Id.* She left her mother's home in March 1997, after reporting the sexual abuse to her guidance counselor at school. The complainant testified that Burch was touching her "[i]n [her] private areas[,]" meaning her "breasts and . . . vagina area." T.209-10. According to the complainant's recollection, the incident at issue had occurred after "a couple of days" after Valentine's Day in 1997. B.B. remembered that it was near Valentine's Day because she had "heard a thing on the radio about like a – competition kissing [sic] . . . and [she] asked [Burch] about it." T.210, 218. In response to her question about the kissing contest, Burch then

---

[3]       Citations to "T.__" refer to the transcript of the 1998 trial before Judge Noonan, submitted by respondent's attorney in connection with the answer to the habeas petition.

"started kissing [her]." *Id.* The complainant recalled that when Burch kissed her, it was "almost .

. . like [she] couldn't breath [sic]." T.210 She testified that Burch also rubbed her breasts. T.211.

(This alleged instance of Burch kissing her and touching her breasts was not part of the

indictment.)

When asked by the assistant district attorney whether there was "another day when

something else happened," T.211, the victim replied affirmatively, but could not pinpoint a date:

> Q:    When did that [second incident] occur?
> A:    Um, I'm not quite sure.
> Q:    Did it occur sometime before you left the house?
> A:    Yes.
> Q:    Did it occur sometime before you told your guidance counselor?
> A:    Yes.
> Q:    Can you give us an idea of when that would have happened?
> A:    Like I can't remember quite when, but - -
> Q:    Is there an occasion that comes to mind.
> A:    Not really.
> Q:    Is it fair to say it was after Valentine's Day and before you left in March?
> A:    Yes.

T.211-12. Defense counsel did not object to that line of questioning by the prosecutor. The

complainant then testified that on the second occasion, Burch "forced her on [his] bed and he

started kissing [her]," and "touched the inside of [her] vagina." T.212. She "hardly could move."

T.212. When Burch "would stick [his fingers] inside [her] vagina," it was painful and "felt like

crayfish pinchers[.]" The complainant explained that being pinched by crayfish feels "like a

bunch of nails are sticking into your skin." T.218.

She stated that she did not tell anyone immediately what had happened because she was

"scared [she] would get in trouble." She also testified that Burch and her mother were going to a

shooting range, and she was afraid that Burch was going to shoot her mother. T.213.

The complainant related that years earlier, she had been abused at age three by her paternal grandfather. When the prosecutor asked if she remembered where that incident happened, the complainant replied, "Not quite. It's vivid [sic]." T.215.  The complainant at first was unable to recount any details of the abuse, stating simply, "Um, my grandfather abused me." T.215. She then elaborated somewhat, stating that her grandfather had "touched [her]" "[l]ike all over" with "his hands and his penis," but she could not recall "how [her grandfather] touched [her]." T.215. When asked what her grandfather did with his hands, the complainant replied, "I'm not quite sure." T.216, *see also* T.217-18. When asked if there was "any pain associated when [her] grandfather abused [her]," she replied, "I remember like I was just laying on the bed and there was like – like pinching my shoulder." T.216. She later said that there was no pain associated with when her grandfather abused her, but she reiterated that there was pain when petitioner touched her. T.217. When asked if she remembered her grandfather doing "anything with his fingers or penis to put them inside [her]" she replied, "I'm not sure." T.216.

On cross-examination, the complainant admitted that at first she thought petitioner "was okay because he like bought [their family] a whole bunch of stuff."  The complainant admitted that she told her mother that she "didn't want her [mother] to be in a relationship just then," T.226, but did not say anything specific to her mother about Burch.

Trial counsel elicited admissions from the victim that she had lied to her mother and to petitioner's mother, who was like her grandmother, on several occasions in the past about whether she had done her homework. T.225.

The victim admitted that in January 1997, she and her mother had gotten into an argument "involving string." She said that she was "kicking and it threw her [mother's] glasses

off." T.232. While she was struggling to get way from her mother, who was trying to spank her, the complainant admitted that she threatened to call child protective services. However, she never did. T.232, 233.

Trial counsel then asked her to describe again the two incidents[4] about which she had testified on direct examination. The complainant indicated that the first incident occurred while her mother "[m]ost likely" was at work, but she did not recall the exact time or date. T.234. She surmised that she and Burch were "[p]robably" watching T.V. T.235. The second incident, in which petitioner inserted his finger into her vagina, occurred during the afternoon "a couple of days later" in the bedroom shared by petitioner and her mother. T.235. T.236. Burch "took [her] upstairs" and then "he pushed [her] on the bed," where he "held [her] down and he kissed [her]" with his hands "[l]ike in front of him on [her] shoulders." T.237. According to the complainant, her brother and sister were present in the house on both occasions. T.234, 236.

Trial counsel then chose to elicit testimony about *additional* uncharged incidents of sexual abuse, asking the complainant, "Were there *any other times* [that Burch touched her]?" T.238 (emphases supplied). She responded that there were "[m]aybe two," in addition to the two described above. T.238. The complainant explained that petitioner did "the same thing," T.238, that is, he touched her in her vaginal area with his fingers. T.238-39. She stated that a third incident occurred in petitioner's bedroom while her brother and sister also were in the house, but she could not provide a date and could not say whether it occurred in the daytime or nighttime. T.239. She then contradicted her earlier testimony, admitting that she was "not sure" if there was a fourth incident. T.240.

---

[4] Only one incident—the one that allegedly occurred on or around Valentine's Day in 1997, was charged in the indictment.

Later during his cross-examination of the victim, trial counsel returned to the topic of the other instances during which Burch allegedly touched her inappropriately, asking her, "[W]here did [petitioner] kiss you during those times?" T.261. The complainant replied that Burch kissed her on her mouth. T.261. Although *no* oral-genital contact was alleged in the indictment or brought up by the prosecutor during direct examination of the complainant, trial counsel asked her, "Did [petitioner] ever kiss you on the vagina?" T.261. The complainant responded, "Yes," and said that it occurred "[w]hen they were up in the room [*i.e.*, Burch and her mother's bedroom]." T.261. The complainant agreed that Burch kissed her on her vagina occurred only once "out of the three or four instances" that he abused her. T.262. Apparently attempting to show that the victim's recollection was faulty and inconsistent, trial counsel brought up her testimony in the family court proceeding in which she testified that he did "more to [her] than he did the first time," T.263, and that "[s]ince the first time he has on three or four occasions rubbed his fingers inside of [her] vagina and kissed [her] vagina." T.264. Trial counsel asked the complainant if she recalled testifying previously, at the family court proceeding, that the abuse occurred "maybe five or six" times and she said, "No, I didn't really recall that." The victim indicated that she believed she testified that petitioner touched her "maybe two, maybe three" times. T.265.

Trial counsel then questioned the complainant about March 19th, day she reported the abuse. She recalled the date, she said, because she had gone home sick from school at about 2 p.m.; Burch's brother, Lance Burch ("Lance"), picked her up at school and brought her home. T.240-41. Because petitioner's brother, was playing computer games and "wasn't paying any attention to [her]," the complainant decided to walk back to school to get her homework from her

English teacher. T.242. The victim testified that her teacher thought something was wrong so she took her (the victim) to the guidance counselor's office. T.242.

When Burch first moved in with them, the complainant thought that he was going to be like her sister's father who had been physically abusive. T.253-54. Trial counsel then explored the complainant's feelings about her mother's relationship with Burch by introducing the complainant's testimony from the family court proceeding where she testified that she told her mother about her apprehensions but her mother "told [her] to forget about it and so [she] did." T.255. The complainant admitted that she wanted her mother "to give him [Burch] up[.]" T.255.

Trial counsel's next focus of cross-examination was to elicit the complainant's opinion of petitioner, asking her, "What kind of man is Mr. Burch?" T.243. The complainant testified, "Well, right now I think he's sick." T.243. Trial counsel then attempted to clarify the question, referring the complainant to the period of time that she was living with him. T.243. The complainant said that she "thought he was nice" and she agreed that he "was good to [her] mom[.]" T.243, 251. The complainant admitted that Burch never hit her mother, like the previous boyfriends had. T.244. Before the abuse occurred, the complainant said that she felt that petitioner "was a nice guy" but that after he "did this to [her]," she did not feel safe around him. T.253. Trial counsel elicited testimony that she did not feel safe around Burch "[f]rom the very beginning" because "he just didn't look like a safe person." T.256. When asked what she meant, the complainant testified, "Like, um, he would like work at night and sleep all day, and I just didn't feel safe." T.256. The complainant testified that it was "safe to say" that she "wanted him out of the house . . . from the first time he moved in[.]" T.256.

Defense counsel questioned the complainant about Burch's alleged threats not to reveal

the sexual abuse: "[O]nce he told me I shouldn't tell my mom. . . [l]ike about the abuse." T.244.

Trial counsel asked if petitioner told the complainant what would happen if she told her mother.

The complainant replied, "No, except for like she would be mad at me or something." T.244.

Trial counsel then attempted to have the victim characterize her relationship with her mother as contentious. However, she disagreed with defense counsel's characterization of her mother as "often mad" at her, stating it was "[o]nly like when [she] was bad." T.244. The complainant testified that petitioner punished her "[a] couple of times" by grounding her for failing to do her homework and the dishes. T.245. The complainant stated that she got spanked on occasion but was "not quite sure" when it happened. T.246. She stated that getting a spanking "made [her] cry." T.246.

### b.    The Prosecution's Medical Expert: Dr. Robert Daniels

Robert Daniels, M.D. ("Dr. Daniels") testified as the prosecution's expert witness in its case-in-chief. Upon examining the victim, Dr. Daniels found that her hymenal ring was broken and that there was a "posterior tag," which "by definition means that there had been a tear along this side and this side of her hymenal ring." T.282-82.  Instead of a "nice soft tissue opening," T.282, the edges of the vagina appeared to Dr. Daniels to be "calloused from chronic penetration," T.282.  Dr. Daniels opined that, to a reasonable degree of medical certainty, the physical findings were caused by "[c]hronic vaginal introduction." T.282. Dr. Daniels testified that the penetration would have had to have been done "many" or "multiple times over a course of a fairly decent amount of time" in order to produce the physical symptoms he found. T.284. The doctor likened the victim's sub-acute injuries to "a callous, [which] . . . just cannot happen overnight." Dr. Daniels explained that the victim's vaginal opening had "adapted to penetration

the way most adult vaginas do." T.284. In his opinion, the victim's broken hymenal ring had

occurred when she was near maturity (as she was at the time of the allegations), not when she

was three years-old. T.285. He opined that, to a reasonable degree of medical certainty, the

injuries to the victim's vagina were caused by repeated penetration at or near the time of

maturity. T.286.  Dr. Daniels testified that "it had not happened recently . . . [b]ut it had

happened many times." T.284.

On cross-examination, Dr. Daniels stated that he "would guess" that the "minimum"

number of penetrations that could have caused the condition seen in the victim was "four or five

times over the course of about two to three weeks." T.287. When asked whether "two or three

times [would] have done it," Dr. Daniels testified "[p]ossibly," but it would be "less likely."

T.287, 288. Dr. Daniels testified that the victim would have felt pain "initially" but over time the

tissue would become adapted to the penetration and there would not be "nearly as much" pain.

T.286. Dr.

Daniels conceded that the disruption of the victim's hymen could have occurred a year

before the alleged incident. T.288. When asked if the victim could have disrupted her own

hymen, Dr. Daniels stated, "I imagine she could have. It would have been very painful. I suppose

she could have." T.289. He did not agree that she could have gotten the callousing of the tissue

by just "exploring herself," explaining that she would have to do more than explore–she would

have had to chronically rub the area for it to become adapted. T.289. Dr. Daniels conceded that

the complainant did not say anything about a sharp pain when she gave her medical history; she

did mention that there was "some pain" but she "wasn't very specific about it[.]" T.290.

On re-direct, Dr. Daniels agreed that it was "true" that the injury could have been caused

by "somebody sticking his finger inside of her vagina and rubbing it back and forth." T.291. That is what he meant by the chronic injury. T.291. Dr. Daniels reiterated that he did not believe that the injury was self-inflicted "because the first time [it occurred] would have been quite painful[.]" T.291.

On re-cross, Dr. Daniels admitted that he could not pinpoint when the first instance of penetration would have been, stating that it could have been some period of time, e.g., months, before the callousing happened. T.291-92.

However, Dr. Daniels opined on re-re-direct that the initial penetration "[a]bsolutely" could have occurred during a shorter period of time (i.e., "weeks or days possibly") before the callousing occurred. T.292.

### c. The Complainant's Younger Sister

The victim's eight-year-old half-sister S.R. testified as an unsworn witness for the prosecution. S.R. testified that she "[s]ometimes" saw Burch and the complainant kiss but she did not know what kind of kisses they would do. T.314.  S.R. testified that Burch did not kiss the complainant in the same way he would kiss her mother. *Id.* The sister testified that she "sometimes [sic]" remembered Burch kissing the victim around Valentine's Day, but that it was a short kiss, not a long kiss. T.315.  S.R. denied remembering "telling anybody that sometimes it would be a long kiss[.]" The prosecution rested its case thereafter. T.318.

### 2. Defense Counsel's Motion to Dismiss the Indictment

At the close of the prosecution's direct case, trial counsel moved to dismiss the indictment "upon the People's lack of proof of any substantial pain or impairment of bodily condition which is part of the element of the offense charged[,]" arguing that the complainant's

testimony did not "come up to the legal requirements of substantial pain." T.318. Trial counsel noted that the complainant stated that "it didn't even cause her to cry, it was a brief duration, didn't last any more than whatever the act was [and] [s]he couldn't be very specific about how long that was." T.318. After reviewing his notes, the trial judge agreed with the prosecutor's argument that the victim "did say it's like a crayfish pinching you, like nails sticking into your skin." T.322. The trial judge also agreed that, contrary to defense counsel's contention, the complainant had testified sufficiently to create an issue of fact as to forcible compulsion, in that she testified that Burch held her down with hands on her shoulders and that the "kissing occurred to the point where she either said she couldn't breath [sic] or it was smothering[.]" T.324, 325. Accordingly, the trial court denied the motion to dismiss the indictment. T.325.

### 3. The Defense Case

#### a. Petitioner

Burch testified that he had injured his knee in basic training while in the Army and received a disability-based discharge on October 31, 1991. As a result, he developed degenerative osteoarthritis which, along with the criminal charges pending against him, now prevents him from working. T.428. In 1996, he was working as the head full-time sales associate at Radio Shack. T.430-31. He was having a lot of problems with his knee at the time; he had to wear a neoprene brace and would have to sit down when work got too taxing. T.433. He was taking prescription Tylenol with codeine for the pain. T.435. Sometimes his knee would give out and he would fall down. T.435-36. As a result of his knee problems, he was not able to help the complainant's mother with the household chores as much or spend as much time with the children as he had wanted to do. T.436.

He and the complainant's mother started dating in April 1994 and he moved in with her in September 1994. He did not feel that there were any problems at first between him and the children when he moved in. T.437. The children, including the complainant, called him "dad." T.442. With their mother's permission, he would sometimes discipline the children if they did not do their chores or get their homework done; that ranged from taking money out of their "penny jar" to spankings. T.438-39.

In March 1997, he and A.B. had an agreement with the complainant that if she kept up her chores, did not get in-school suspension, did not throw tantrums or argue with her mother, for 30 days without any incident, he was going to buy her bookshelf stereo system. T.440. Burch brought one home from work, but he ended up having to return it about three days before the complainant "turned [them] in." T.441. Burch testified that it was a Friday, and the complainant had argued with her mother about what she was wearing to school. Burch told her that since she had broken the agreement, he was going to take it back, and he did that next Sunday. The following day, March 19, 1997, was when the complainant made the allegations of sexual abuse. T.441.

Burch did not recollect the incident around Valentine's Day of 1997 that the complainant had described, in which she had asked him what a "competition kiss" was. T.442. Burch denied ever giving her a long kiss on the lips, or touching her breasts or vagina with his hands or mouth. T.443.

On cross-examination, Burch insisted that on every occasion he watched the children, somebody would be there in "[s]ome shape or form" and that he "[a]lways" had company, and was "never" alone, stating that "Ann used to complain about it." T.448; *see also* T.453, 455. The

prosecutor confronted Burch with his statement to Detective Warner of the Jamestown Police Department in which he said that "roughly 90 percent of the time [he] was not alone" with the children. T.453. Burch testified that was not correct.

The prosecutor confronted Burch with his time-records from Radio Shack for Saturday, February 15th, which indicated he worked from 9 a.m. to 10 a.m. T.447. Burch stated, however, that the record reflected how many hours he was paid for, but he "could have been" working until 10 p.m. and not have gotten paid for it; he did not "remember exactly what happened all that day." T.447. Burch reiterated his testimony that he believed that he worked until 10 p.m. even though he only got paid for an hour. T.450. Burch agreed that there was no visitors listed for February 15th in the date-book specially prepared by A.B.; the book indicated that only his brother, Lance, was babysitting. T.449. Although his brother had not testified yet, Burch stated that he knew Lance had to work at 5:30 p.m. T.452. Burch agreed that if Lance was not babysitting until 9:30 p.m., when the complainant's mother got off work, then somebody would have had to come over and baby-sat for free. Burch admitted that did not know who that would have been. He acknowledged that the complainant's mother had not listed any other babysitter besides Lance in her date-book. T.452.

### b.     The Complainant's Mother/Petitioner's Girlfriend

Defense counsel called the complainant's mother, A.B., who had since become engaged to Burch. T.338-39. A.B. testified that her romantic relationship prior to the one with Burch had been "[v]ery abusive", both physically and verbally. T.340. She stated that her relationship with Burch was different in that it "wasn't as controlling" and she agreed with defense counsel that it was "very cooperative." T.342. A.B. testified that there was "not really" "any friction" between

her children and Burch; "[i]t was just the fact . . . they [her children] weren't too sure because it was a male, because of the previous [abusive] relationship" with S.R.'s father. T.342. A.B. testified that the children were "very careful" around Burch because "they were used to getting in trouble all the time for doing just little things." T.342. A.B. testified that as far as she could tell, the complainant accepted Burch when she and petitioner started dating in 1993. T.342. When asked if she ever had a conversation with the complainant about her wanting her mother to "give him up," A.B. testified (contrary to what the complainant had said), "No, not that I can remember." T.343.

In the 1996-1997 school year, the complainant started going to a new school and was "[c]onstantly" having discipline problems whereas before, she only had such problems occasionally. T.344-45. She was getting "into confrontations with other kids," she would "butt into other people's business or get detention or in-school suspension," and would "constantly go into the school or class late, and she'd be somewhere after school that she shouldn't have been . . . ." T.345. At home, the complainant was not doing her homework and was not doing things that she knew she had to do, such as doing chores and cleaning her room. T.346. When told that she needed to do them, the complainant would respond, "you can't make me." T.346. Over the course of the school year, the complainant "got more defiant" to both her mother and Burch. T.347. When her mother questioned her about things that had happened at school and about which the school had called home, the complainant "would just totally deny it" or "blame it on somebody else." T.347; *see also* T.401-02. A.B. testified that because the complainant kept getting caught in a "series" of lies about things such as getting detention or in-school suspension, it "was hard to believe anything she would tell" her mother. T.402.

A.B. testified that on "[s]everal occasions" the complainant threatened to call Child Protective Services on her mother and Burch. The first instance happened around Thanksgiving of 1996, and was made in response to being told to do the dishes and have them done by a certain time. T.348-49. A.B. recalled another incident that occurred in early February 1997, on a Sunday. A.B. testified that she went up to the complainant to ask her why there was kite string strung throughout the house; she "touched her shoulder to get her attention" and the complainant turned around, "grabbed [her] arm, and pulled [her] down to the floor." T.351. The complainant "proceeded to say leave me alone, you can't touch me, and she kicked [her] glasses off [her] face." T.351. Said she was going to call Child Protective Services because she believed her mother "just went to spank [her]," to which A.B. replied that she wanted to ask her what was going on because her younger brother and sister were running through the house screaming. T.351. The third threat to call Child Protective Services occurred a few weeks later (right around the time of the alleged incident) when the complainant was told that she could not go to a Valentine's Day dance at school because she had not kept up on her chores and had not completed a number homework assignments. Ultimately, the complainant was allowed to go to the dance. T.353.

When asked if she noticed any changes in the complainant or whether she seemed "afraid of anything or disturbed or bothered," A.B. replied that the complainant "would just constantly tell [her] to come home and tell [her] that she got in arguments with school or just little things, things that kids do in school." T.354. A.B. testified that the complainant never exhibited any fear of Burch. *Id.*

On cross-examination, A.B. admitted that she was engaged to Burch to be married once

her divorce proceedings were final, and that he was the first boyfriend in nine years that had treated her well. A.B. testified that she did not believe her daughter's allegations about Burch. T.377. However, A.B. did not agree that it was "impossible" for Burch to have been alone with the complainant. T.377-79. Over trial counsel's objection, the prosecutor then impeached the complainant's mother with her testimony from the earlier family court proceeding in which she testified that the "'biggest reason'" she did not believe her daughter was that there "'was no time in which the allegations could have occurred.'" T.378. That statement was based on the date-book A.B. made regarding the times she and Burch were at work. T.379. A.B. testified at the family court proceeding that on February 15th, they worked similar shifts; she worked "11 to 9" and Burch worked "9 to 10". T.379, 388. She worked until 9:30 at night, but she did not recall if Burch worked until 10 p.m. or 10 a.m. She believed he worked until 10 p.m. T.397. A.B. conceded that if he only worked until 10 a.m., petitioner "[p]ossibly" would have baby-sat the children while she was at work. T.389. Over defense counsel objection, *see* T.379-84, the prosecutor cross-examined A.B. using the personal date-book she had kept for the relevant time-period regarding her and Burch's work schedules; her own document that she created regarding their various baby-sitters and the hours they worked; and an official document submitted to the Department of Social Services' program for reimbursement for their baby-sitting expenses. T.378-99. That document indicated that petitioner's brother, baby-sat for 7 hours on February 15th. T.395.

A.B. testified that the "major reason" was because the work schedules did not permit, and it was to "a large extent due to" Burch's alleged physical disability, and "to some extent" because her daughter lied about whether she had done homework, chores, suspension at school.

T.408. The prosecutor questioned A.B. as to how petitioner was "[s]o limited" in his physical

capabilities that he could still bowl three games every Friday night, for thirty-two consecutive

weeks, in a bowling league for two years. T.409. A.B. admitted that they were in a bowling

league together but said that he "may have gone and sat" instead of bowling. T.410.

### c.    Lance Burch:  The Babysitter and Petitioner's Brother

Petitioner's brother, Lance, testified for the defense that he babysat for the complainant

about twenty hours a week for about a year to a year and a half. T.412. Lance testified that the

complainant was "an argumentative child" but they "got along pretty good," T.415, although the

complainant sometimes threatened to report him to Child Protective Services when they would

argue about her doing the dishes or cleaning her room. T.416. Lance admitted on cross-

examination that the complainant never followed through on her threats, however. Lance

testified that he never saw the complainant act "afraid" around his brother, the petitioner. T.417.

Lance confirmed A.B.'s testimony about the complainant's behavior when she was around

Burch at the Easter pageant after the incident, stating that the complainant was "[n]o different

than any other day."  T.418-19. Lance recalled that the complainant wanted to go to lunch with

Burch and her mother. T.419. Lance did not go out to eat with the rest of the family.

On cross-examination, the prosecutor introduced Lance's employment records from

Camelot Music which indicated that worked there from 5:30 p.m. to 9:30 p.m. on February 15,

1997. T.424. Lance did not recall who was left in charge at home, but admitted that Burch "could

have" been. T.424.

### d.    Linda Kay Burch:    Petitioner's Mother

Mrs. Burch knew A.B. and her children through participating in joint neighborhood

projects together; this was before Burch and A.B. began dating. Also, Mrs. Burch's daughter lived across the street from A.B. T.474. Mrs. Burch testified that she loved the complainant, Drake and Shannon, and they all called her grandma. T.475. Mrs. Burch also was the art teacher at the complainant's elementary school. T.475. Petitioner attempted to have Mrs. Burch testify about something called "Project No," which was part of the fifth-grade curriculum at the school, but because she did not have personal knowledge of the contents of the curriculum, the trial court sustained the prosecutor's objections when counsel asked if it discussed sexual contact. T.478-80.

Mrs. Burch testified that she and the complainant had a very good friendship with the complainant, and that she and the complainant trusted each other. The complainant would quite frequently confide in Mrs. Burch about confidential things, like parents, school, friends, brothers and sisters, different everyday activities. T.481. In 1996-1997, after she started junior high school, "[o]n occasions" the complainant would tell her that "she knew how and would turn her parents in" to Child Protective Services ("CPS"). T.482. They had these conversations "[w]henever things didn't go [the complainant's] way, a lot of times." T.482. Mrs. Burch admitted that the first time she mentioned the complainant's threats to call CPS was during one of the prior family court proceedings on this matter; she did not tell the police department or the district attorney's office or social services. T.494, 496.

Mrs. Burch recalled on particular time, around February 14,1997, when the complainant wanted to go to a Valentine's Day school dance on, and her parents would not let her go, and she wanted Mrs. Burch to intervene on her behalf. T.483. The complainant was "really upset and she said if they don't let me go, this is . . . one of the times, she said[,] I could turn then [sic] in." T.

483. The complainant told Mrs. Burch that she knew who to call at Child Protective Services. T.484. Mrs. Burch talked to her daughter, and ultimately the complainant was allowed to go to the dance.

Mrs. Burch testified that the complainant never displayed any fear of petitioner and called him "daddy." After Valentine's Day, she did not observe any changes in the complainant. T.485.

Following the complainant's disclosure to her guidance counselor on March 19, 1997, Mrs. Burch observed the complainant interact with petitioner at the Easter pageant; petitioner was part of the stage crew. T.486-87. Afterwards, the family was planning to go out to dinner, and the complainant asked if she could go with them. T.487. Mrs. Burch knew that the complainant was still at the "safe house" and believed that the complainant was not allowed to go with them, but the complainant said that she would call and get permission. T.487. Mrs. Burch heard the complainant call and tell the "safe house" only that they were going to be a little longer because they had to clean up after the pageant; the child did not mention going out to dinner with her mother and Burch. T.488.

Mrs. Burch testified that throughout the pageant and dinner, the complainant showed no hesitation or fear in dealing with petitioner; she interacted and chatted with him as she usually did. T.489.

Several months later, in December 1997, there was a family birthday party at the bowling alley; the complainant was not invited to it and Mrs. Burch did not know she was going to be there. Apparently, the complainant was with her foster mother. After the foster mother left, the complainant approached Mrs. Burch and said "[s]omething about she had made a mistake, she

couldn't change it, and she wishes she could, something on that order[.]" T.502; *see also* T.498. The complainant was not any more specific than that and, as she was so taken aback by the comment, Mrs. Burch did not question her about it, although she believed she knew what the complainant was talking about "because of conversations that [they] have had." T.502. Mrs. Burch told the complainant that they could pray about it and they could see if the complainant could talk to someone who could help her make a decision. *Id.*

### 4.    The Prosecution's Rebuttal Case

The prosecution's key rebuttal witness was Dr. Anthony Bongiovanni, a child psychologist who previously been qualified as an expert witness in family courts and criminal courts in several counties in New York state. *See* T.562 *et seq.* The prosecutor presented Dr. Bongiovanni with several hypothetical situations. The first hypothetical involved "an 11 year old girl [who] is sexually abused by digital penetration of the vagina by her father substitute," and who, more than a month after the incident, reports it not to her mother but to a school guidance counselor. He was asked whether there was "any explanation that you can give, any syndrome to which that might attach[.]" T.564. Dr. Bongiovanni replied, "Yes," and proceeded to explain the tenets of Child Sexual Abuse Accommodation Syndrome, as articulated in 1983 by Dr. Roland Summit. T.564.

Dr. Bongiovanni described Child Sexual Abuse Accommodation Syndrome as a collection of behaviors of family dynamics that included "several paradoxic [sic] or questionable or opposite types of questions that are answered." *Id.* He stated,

> It is not unusual at all for a child who is sexually abused not to disclose that abuse immediately. In fact, it is the opinion of most, and I share that opinion, that most children do not disclose the abuse for several weeks, several months, several years. In fact, there is ample research to indicate that many children do not

disclose being sexually abused until they are adults. And the thought is that there are many more who never disclose.

So the idea of disclosing is a very frightening thing for the vast majority of children. They feel frightened, they are often put under a cloak of secrecy by the individual who abused them, . . .

As this goes on, the child begins to feel very helpless, very controlled and continues ironically to allow the abuse to go on. This is what is known as accommodation. In other words, the child allows the abuse to continue, accommodates a family, in other words, allows things to go on so that things remain the same even though they may be under significant pain and turmoil. Then sometimes what happens is in a delayed fashion the child will disclose it. There are many reasons why. A child may just have had enough. A child may be going through a troubled or conflictual [sic] time where their emotions arise when they are angry, and under the heat of emotions, sometimes things come out.

It's quite usual that the child will not initially disclose to a family member. It's often a friend, it's particularly often a school personnel [sic]; teacher, guidance counselor, school psychologist. There is a sense of more safety in disclosing it to someone else.

Again, within the accommodation there are many times when the child's statements can be viewed as inconsistent, as not making sense, and there are many times - -

T.565-67 (emphases supplied). At that point, trial counsel finally objected that Dr. Bongiovanni had "gone far afield from the question that was asked." T.567. The trial court direct the prosecutor to move on to the next question, which was a hypothetical with the same subject as the first one, and asked the doctor why such a person, despite being abused, seeks to reunite with the family, to go to dinner with the family including the abuser." T.567. Dr. Bongiovanni testified,

Once again, that is not a particularly unusual phenomenon. One has to understand that absent the act of sexual abuse, many children have ironically a positive or healthy relationship with the same individual who is abusing them. Once a child has disclosed sexual abuse, typically that child's world comes apart. The family becomes fragmented. Somebody is removed from the home . . . and the child may start to feel guilty for having done this . . . . So many times the child in an effort to repair things . . . will often continue to want to interact with the very same person who had sexually abused him or her. That is not an unusual occurrence.

-24-

T.567-68. This exposition evoked no objection from trial counsel.

The prosecution's third and last hypothetical involved the same victim-profile. This time, the victim, after eight or nine months after reporting the incident, "says to a grand parental [sic] figure I made a mistake and I can't undo it, is there an explanation for that[?]" T.568. Dr. Bongiovanni opined that "[o]ften a child will retract or . . . recant" as "things change typically in a dramatic fashion after a child has disclosed." T.568. Dr. Bongiovanni testified,

> A child[,] out of a sense of guilt, anxiety, fear, apprehension, whatever, may feel [it] incumbent upon themselves to once again fix things up, change it, recant it, say it didn't happen, say I lied, as a means of putting an end to a highly conflictual [sic] and typically fragmented family situation by that time. They are willing to be viewed as not telling the truth. They are even willing to be viewed as psychiatrically ill or disturbed as a means of just getting things back to status quo.

T.568-69. Defense counsel did not object to this testimony.

Finally, Dr. Bongiovanni was asked whether "these matters to which [he] just testified" were "all in some type of psychiatrically or psychologically recognized syndrome?" T.569. He stated that "[t]his is a syndrome, the Child Sexual Abuse Accommodation Syndrome, noted by people, professionals, who are well experienced and have, unfortunately, a lot of experience in this particular area." *Id.* Again, this testimony came in unopposed by defense counsel. Furthermore, defense counsel did not cross-examine Dr. Bongiovanni, stating he had "[n]o questions." *Id.*

### 5.    The Jury Charge and the Verdict

When charging the jury regarding the contents of the indictment, the trial court issued the following instruction:

> This indictment charges[5] the defendant, Lawrence Burch, with aggravated sexual abuse in the second degree alleging that shortly after Valentine's Day, on or about February 14th or 15th, in the City of Jamestown, in the County of Chautauqua, he inserted his finger into the vagina of another person, [B.B.], causing physical injury to that person by forcible compulsion.

The jury returned a verdict convicting Burch as charged, of one count of second degree aggravated sexual abuse on May 1, 1998.

### 6.    Sentencing

Soon after Burch's trial ended, defense counsel Nihoul evidently left the state of New York and went to Florida to live, taking Burch's entire file with him. Fagan Habeas Aff., ¶29.[6] Nihoul did not appear for Burch's sentencing hearing, which was adjourned so as to allow new counsel to be assigned to represent petitioner. Fagan Habeas Aff., ¶31. On July 31, 1998, new assigned counsel Peter D. Clark, Esq., appeared with Burch for sentencing. The trial court imposed an indeterminate term of imprisonment of four to eight years. Clark filed a notice of appeal that same day, but the preparation of the brief and oral argument was handled by Fagan, whom Burch's family and friends had retained to represent him.

### 8.    Post-Conviction Proceedings

#### a.    Petitioner's Collateral Attacks on the Conviction

---

[5]    As noted above, the indictment did not specify a date on which the alleged sexual abuse had occurred; it only identified the time period as "February 1997." Furthermore, the prosecution did not file a bill of particulars, because defense counsel Nihoul did not request one. Fagan Habeas Aff., ¶25.

[6]    Fagan indicates that when Nihoul was first assigned to represent Burch, he was an assistant public defender with the Chautauqua County Public Defender's Office. Fagan also claims that in the months prior to Burch's third trial, Nihoul was arrested during a sting operation for possession of marijuana and was under "extreme pressure,"Fagan Habeas Aff., ¶29, by the Public Defender's Office to resign, *see id.* At some point, which Fagan does not specify, Nihoul was terminated as an employee of the Public Defender's Office and, at the time he was representing Burch, was in practice by himself. *See id.* As the Chautauqua County District Attorney's office has pointed out, *see, e.g.*, People's Brief on Direct Appeal, attorney Fagan has not provided any documentation to substantiate these claims regarding Nihoul's arrest and termination from the Public Defender's Office.

On August 31, 1998, Fagan filed a motion to vacate the judgment pursuant to New York

Criminal Procedure Law ("C.P.L.") § 440.10(1)(f) and (h) alleging that Burch was denied the

ineffective assistance of trial counsel because counsel, *inter alia*, allowed the introduction of

uncharged crimes through the testimony of prosecution expert Dr. Daniels and through the cross-

examination of the victim, and failed to cross-examine prosecution rebuttal expert witness Dr.

Bongiovanni. *See* Post-Trial Proceedings at 64-67. Oral argument was held before Judge

Noonan, the trial judge, on September 22, 1998. Judge Noonan thereafter denied the C.P.L. §

440.10 motion in a written decision and order, but granted Burch's application for a stay of the

judgment while his direct appeal was pending. *See* Petition at 4, ¶15 (Docket No. 1).

Still represented by attorney Fagan, Burch filed a second C.P.L. § 440.10 motion alleging

that he received ineffective assistance of trial counsel, that his sentence was harsh and excessive,

and that newly discovered evidence in the form of polygraph-test results showed that he was

innocent. On February 25, 1999, the trial court (Noonan, J.) summarily denied this motion

pursuant to C.P.L. § 440.30(2) and (4)(a), (b). *See* Record of Post-Trial Proceedings Submitted

by Respondent at 165-67 (hereinafter "R.__").

Attorney Fagan has indicated that the Appellate Division, Fourth Department, of New

York State Supreme Court granted leave to appeal on April 5, 1999, with regard to the initial

C.P.L. § 440.10 motion. Fagan Habeas Aff., ¶¶ 13-14. Also, according to Fagan, the Appellate

Division granted leave to appeal the denial of the second C.P.L. § 440.10 motion on June 11,

1999. Fagan Habeas Aff., ¶15. This Court was unable to locate a copy of the certificate granting

leave in the documents submitted by respondent.

In any event, on May 10, 2000, the Appellate Division, Fourth Department, unanimously

affirmed Judge Noonan's decisions regarding the two C.P.L. § 440.10 motions in a summary order. *See* Exhibit A to Fagan Habeas Aff.; R.168-69; *People v. Burch*, 272 A.D.2d 855. Fagan sought leave to appeal to the New York Court of Appeals, but this was denied on October 26, 2000. Fagan Habeas Aff., ¶¶ 20 *et seq.*; R.170.

### b.  Direct Appeal

It is unclear on what date Burch, through attorney Fagan, filed his direct appeal of the judgment of conviction. In his brief, Fagan raised the following claims: (1) trial counsel was ineffective in (a) failing to seek pre-trial discovery, (b) failing to prepare adequately for trial,[7] (c) allowing the introduction of uncharged crimes through the cross-examination of the victim, (d) failing to object to certain expert witness testimony, (e) failing to cross-examine the prosecution's rebuttal expert, (f) appearing disorganized and confused in his opening statement, (g) negating the alleged defense theory in his summation, and (h) failing to appear for sentencing; (2) the trial court erred in not charging the jury on lesser included offenses; and (3) the trial court erred in specifying a date of the alleged incident when it read the indictment to the jury.

The Appellate Division issued a memorandum decision and order affirming Burch's conviction. The Appellate Division noted that while trial counsel's representation of Burch was "not error free," Burch nevertheless received "meaningful representation" under *People v. Baldi*.

---

[7]     For instance, attorney Nihoul objected to the prosecution's use of the family court transcript for impeachment purposes and complained that he did not have a copy of it. Of course, Nihoul had been present at the family court proceeding and easily could have obtaining a copy of the transcript for his own use. Nihoul informed the court that he did not obtain a transcript of the family court proceeding prior to Burch's third trial because he did not believe that the prosecutor had requested the transcript. T.384-85. At the trial court's request, during the cross-examination of the complainant's mother, the prosecutor provided defense counsel with a copy of the 53-page transcript from the family court proceeding. *Id.*

Leave to appeal to the New York Court of Appeals was denied.

### 9.    The Federal Habeas Petition

On or about April 24, 2003, Burch, through attorney Fagan, filed his Petition (Docket

No. 1) for relief pursuant to 28 U.S.C. § 2254. Ground One of the Petition alleges ineffective

assistance of trial counsel on several grounds, namely, that

> [d]efense counsel elicited uncharged crimes, failed to demand a Bill of
> Particulars, failed to adequately cross-examine victim or the People's expert
> witness, Dr. Robert Daniels, and failed to cross-examine the People's expert
> witness, Dr. Anthony Bongiovanni, at all.

Petition at 7, ¶22(A) (Docket No. 1). Ground Two of the Petition alleges a "Denial of Due

Process" on the basis that the "Trial Court, in its charge to the Jury, supplied dates to the charge

that were not contained in the indictment, but which favored the Prosecution Rebuttal Case, but

were never part of the case in chief." Petition at 8, ¶22(B) (Docket No. 1).

Respondent answered the petition, interposing the defense of untimeliness. In addition,

respondent argued, Burch's claims of ineffective assistance of trial counsel and of trial court

error are without merit. Respondent's Memorandum of Law in Opposition to the Habeas Petition

("Resp't Mem.").

## IV.    Timeliness

The Anti-terrorism and Effective Death Penalty Act ("AEDPA") amended the habeas

statute in 1996 in numerous ways, one of which was to establish a one-year statute of limitations

for petitioners in state custody petitioning for federal habeas corpus relief. The statute of

limitations is tolled, however, for, "[t]he time during which a properly filed application for State

post-conviction or other collateral review with respect to the pertinent judgment or claim is

pending. " 28 U.S.C.A. § 2244(d)(2). The Supreme Court has held that "an application is "

properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee....But in common usage, the question whether an application has been "properly filed" is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar. *Artuz v. Bennet*, 531 U.S. 4, 8-9 (2000). When analyzing the phrase "an application for State post-conviction or other collateral review," 28 U.S.C. § 2244(d)(2), the Supreme Court said, "Congress may have refrained from exclusive reliance on the term 'post-conviction' so as to leave no doubt that the tolling provision applies to all types of state collateral review available after a conviction and not just to those denominated 'post-conviction' in the parlance of a particular jurisdiction." *Duncan v. Walker*, 533 U.S. 167, 177 (2001).

Respondent does not dispute that Burch's motions C.P.L. § 440.10 were "properly filed." Nor does respondent contend that a C.P.L. § 440.10 motion does not constitute an application for "State post-conviction or other collateral review" within the meaning of Section 2244(d)(2). Rather, respondent's only basis for arguing that the petition is untimely is that the third C.P.L. § 440.10 motion does not count for purposes of the tolling provided by Section 2244(d)(2) because petitioner did not include any claims from the third C.P.L. § 440.10 motion in his habeas petition. Clearly, such a requirement is not apparent on the face of the statute. Respondent does not identify any statutory language to support its position; nor does it cite any case law standing for the proposition that such a requirement be engrafted onto Section 2244(d)(2).

There is no question that Burch's three C.P.L. § 440.10 motions provided sufficient tolling under Section 2244(d)(2). Respondent essentially concedes this point since the only way

he can argue that the petition is untimely is if the third C.P.L. § 440.10 motion's pendency is excluded from the computation of time. There being no support for such a methodology in the statute or in the case law, the Court declines to do so here. The petition is timely by virtue of the fact that the three C.P.L. § 440.10 motions sufficiently tolled the statute of limitations under 28 U.S.C. § 2244(d)(2).

**V.      Standard of Review in Habeas Corpus Petitions**

Under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; *or* (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (emphasis supplied). AEDPA's provisions apply to Burch's habeas petition, which was filed after the statute's effective date of April 24, 1996.

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Because the state courts considered and rejected Burch's ineffective assistance claims on the merits, and did not rely upon any state procedural rules for dismissal, "this case is subject to the deferential standard of review of state court adjudications" under AEDPA. *Gersten v. Senkowski*, 426 F.3d 588, 606 (2d Cir. 2005).

Under the "contrary to" clause, "a federal habeas court may grant the writ if the state

court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [that] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause of § 2254(d), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. It is not sufficient under the "unreasonable application" prong of AEDPA for a habeas court to decide to issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although, as the Second Circuit has explained, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted); *accord Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, 341 F.3d 104 (2d Cir. 2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Second Circuit Court of Appeals has

explained that habeas relief may be granted if a state court's decision was "contrary to" or an "unreasonable application" of "a reasonable extension" of the Supreme Court's jurisprudence on an issue. *Torres v. Berbary*, 340 F.3d 63, 68 (2d Cir. 2003).

## VI. Analysis of the Claims Raised in the Petition

### A. Ground One: Ineffective Assistance of Trial Counsel

#### a. General Legal Principles

The Sixth Amendment provides in pertinent part that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. The Supreme Court has explained that the right to counsel means "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970) (emphasis added). A defendant seeking relief based upon a Sixth Amendment claim must prove two elements: First, he must show that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688. Second, he must demonstrate that he was prejudiced by counsel's deficient conduct–that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith*, 539 U.S. 510 (2003); *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002); *Gersten*, 426 F.3d at 607. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The performance and prejudice prongs of *Strickland* may be addressed in any order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.

In evaluating the detriment to petitioner's cause as a result of trial counsel's deficient

performance, the reviewing court looks at the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir.2001). "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. However, "[t]he result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland,* 466 U.S. at 694; *accord*, *e.g.*, *Purdy v. Zeldes*, 337 F.3d 253, 260 (2d Cir. 2003); *see also Lindstadt*, 239 F.3d at 204 ("The level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'") (quoting *Strickland*, 466 U.S. at 693).

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A habeas petitioner following the enactment of AEDPA not only "faces the heavy burden of showing ineffective assistance set forth in *Strickland v. Washington*," but also "the added hurdle posed by the highly deferential review accorded state court adjudications under . . . AEDPA . . . ." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003). "Notwithstanding these obstacles [i.e., *Strickland*'s stringent standard and  AEDPA], if certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, [the reviewing court] would find the quality of representation sufficiently deficient to grant the writ." *Eze*, 321 F.3d at 112.

The Second Circuit has underscored the importance of effective representation for

defendants in child sexual abuse cases. *E.g.,. Gersten* v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005); *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001)). Often the only witnesses to the alleged contact in child sexual abuse cases are the complainant and the accused. *Eze*, 321 F.3d at 112. With third-party witnesses frequently unavailable, these types of cases frequently turn into credibility contests in which the factfinder must choose between contradictory stories told by the defendant and the victim. *Id.* The Second Circuit has instructed that an attorney representing a defendant on charges of child sexual abuse "is obliged, wherever possible, to elucidate any inconsistencies in the complainant's testimony, protect the defendant's credibility, and attack vigorously the reliability of any physical evidence of sexual contact between the defendant and the complainant." *Id.*

Thus, in child sexual abuse cases in particular, the Second Circuit has held that "because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten*, 426 F.3d at 607 (citing *Eze v. Senkowski*, 321 F.3d 110, 127-28 (2d Cir. 2003); *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191, 210 (2d Cir. 2001)). This, the Circuit explained, "particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." *Id.* (citing *Eze*, 321 F.3d at 128; *Pavel*, 261 F.3d at 224). However, as the Second Circuit has affirmed, "[t]here is no *per se* rule that requires trial attorneys to seek out an expert." *Gersten*, 299 F. Supp.2d at 100-01 (quoted with approval *Gersten*, 426 F.3d at 609). And, the Second Circuit pointed out in *Gersten*, it has never held, and

did not "mean to hold that expert consultation is always necessary in order to provide effective assistance of counsel in child sexual abuse cases . . . ." 426 F.3d at 609.  Nevertheless, the Second Circuit suggested in *Lindstadt v. Keane* that it is "'difficult to imagine a child abuse case ... where the defense would not be aided by the assistance of an expert.'" 239 F.3d at 201 (quoting Beth A. Townsend, *Defending the "Indefensible": A Primer to Defending Allegations of Child Abuse*, 45 A.F. L. Rev. 261, 270 (1998)).

In general, trial counsel's strategic choices made after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Stated another way, trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 123 S. Ct. at 2538. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court will usually conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland*'s prejudice prong. *Pavel v. Hollins*, 261 F.3d at 223 (2d Cir.2001) (finding that trial counsel was ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt*, 239 F.3d at 201 ("[D]efense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by

[the prosecution's medical expert] contributed significantly to his ineffectiveness.") (citations omitted)).

 In evaluating prejudice, the reviewing court must "look to the cumulative effect of *all* of counsel's unprofessional errors." *Gersten*, 426 F.3d at 611 (citing *Lindstadt*, 239 F.3d at 204) ("We need not decide whether one or another or less than all of these four errors would suffice, because *Strickland* directs us to look at the totality of the evidence before the judge or jury,' keeping in mind that '[s]ome errors [ ] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. . . .' We therefore consider these errors in the aggregate.") (quoting *Strickland*, 466 U.S. at 695-96; other citations omitted) (emphasis supplied)).

### b. Defense Counsel's Specific Errors

In his petition, Burch alleges that defense counsel failed to provide constitutionally effective representation because he (1) "elicited uncharged crimes"; (2) "failed to demand a Bill of Particulars"; (3) "failed to adequately cross-examine victim or the People's expert witness, Dr. Robert Daniels"; and (4) "failed to cross-examine the People's expert witness, Dr. Anthony Bongiovanni, at all." *See* Petition (Docket No. 1). All of these contentions were raised before the trial court in the C.P.L. § 440.10 motions and, subsequently, before the Appellate Division on direct appeal. In all instances, the state courts adjudicated the claims on the merits. The trial court, after hearing oral argument on the second C.P.L. § 440.10 motion, found that "the evidence, the law and the circumstances of this particular case viewed in their totality, and as of the time of the representation, satisfie[d] [the court] that the Constitutional requirement of effective assistance has been met." C.P.L. § 440.10 Order at 7, Record of Post-Conviction

Proceedings at 130. The trial court stated that in reaching its conclusion, it recognized that defense counsel "utilized a similar strategy and hung the jury in a previous trial." *Id.* Therefore, the trial court found, "it is difficult to conclude that trial counsel's strategy was not a reasonable one based upon the standards set by the [New York] Court of Appeals." *Id.* Finally, the court stated, "[t]he phrase 'meaningful representation' does not mean 'perfect representation[.]'" *Id.* (citations omitted).

On direct appeal, the Appellate Division rejected Burch's claims of ineffective assistance of trial counsel as follows: "Viewing the evidence, the law and the circumstances of this case in totality and as of the time of the representation, we conclude that defendant received meaningful representation." *Id.* (citing *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981)). The Appellate Division noted that although "defendant's representation *was not error free*, defendant failed to demonstrate that he was deprived of a fair trial by less than meaningful representation." *Id.* (quotation omitted; emphasis supplied). The Appellate Division's language demonstrates that it disposed of Burch's ineffective assistance claim on substantive grounds. *See Eze*, 321 F.3d at 122 (citation omitted). The Second Circuit has held that the New York standard for ineffective assistance set forth in *Baldi* is not "contrary to," 28 U.S.C. § 2254(d)(1), the clearly established federal law regarding ineffective assistance of counsel claims, that is, *Strickland v. Washington*. *Eze*, 321 F.3d at 123. The question therefore is whether the state courts' decisions "involved an unreasonable application . . . of clearly established Federal law, as determined by the Supreme Court" in *Strickland*. *Id.* (citing 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 390 (stating that federal habeas petitions alleging ineffective assistance are governed by *Strickland*)). For the reasons that follow, I must conclude that the state courts' rulings that Burch received the

effective assistance of counsel was an unreasonable application of clearly established Federal law.

### 1.)      Failure to Demand a Bill of Particulars

Burch's principal complaint relating to the lack of a bill of particulars is that the prosecution did not ever allege in the indictment, or elicit from the complainant, a specific date on which the sexual abuse occurred. Appellate counsel argued that this precluded trial counsel from preparing an alibi defense for Burch. *See, e.g.*, Petitioner's Appellate Brief at 13, 17. Counsel argued that absent knowledge of a specific date of the alleged abuse, trial counsel would have had to account for petitioner's whereabouts for the entire month of February 1997, but "then went on to negate even this defense during his summation." *Id.* at 17 (citing T.573 ("It would be impossible for me to stand up and tell you [the jury] that Mr. Burch was never alone with these children.")). First of all, it is inaccurate to suggest that trial counsel made any attempt to prove that petitioner was never alone with the complainant and her brother and sister during all of February 1997. Trial counsel made no argument regarding an alibi defense during his opening statement, but rather set out the defense theory of the case that he pursued through the trial–namely, that the abuse never happened and was merely a lie manufactured by the manipulative and defiant victim in an attempt to eject Burch from her mother's life, as well as to retaliate against her mother and Burch for disciplining her. *See* T.195-99. In fact, as respondent has pointed out, the first time it was alleged that petitioner was never alone with the victim was during the prosecutor's cross-examination of the victim's mother. T.377. Then, when he was cross-examined, petitioner also suggested that his work schedule prevented him from ever being alone with the children. T.448. Given that Burch was one of the children's primary caretakers

and lived with them, it would have been exceedingly difficult to prove that he never had the opportunity to be alone with them and, indeed, such a claim would be highly implausible. The fact that Burch lived at the place where the crime alleged was committed rendered any potential alibi defense far less meaningful. *See People v. Watt*, 192 A.D.2d 65, 72, 600 N.Y.S.2d 714, 720 (App. Div. 2d Dept. 1993).

I agree with the state court that although it certainly would have been better practice to make motions, demand a bill of particulars, or serve a notice of alibi, if such is implicated by the pertinent facts of a criminal case, there is "no evidence that the defendant was prejudiced in any fashion by defense counsel's failure to file motions and a bill of particulars" in this case. C.P.L. § 440.10 Order at 4, R.127. Respondent argued, and as the court found, a demand for a bill of particulars "would not have required particularization beyond the time span of the criminal allegations before the [c]ourt" in Burch's case. *Id.*; *see also People v. Bolden*, 194 A.D.2d 834, 834, 598 N.Y.S.2d 603, 604 (App. Div. 4th Dept. 1993) (rejecting contention that indictment was defective because it did not provide sufficient specificity as to the time period alleged for each count of sexual abuse in the first degree where it alleged that two of the incidents, which involved a girl who was then 10 years old, occurred "during the month of June, 1989" and "during the spring of 1989", and alleged that the third incident, involving a boy who was then six years old, occurred "during the summer of 1989"); *People v. Morris*, 61 N.Y.2d 290, 296-97 (N.Y. 1984) (reinstating an indictment that charged the defendant with two sexual offenses perpetrated over a twenty-four day period against two young girls ages five and six, one of whom was the defendant's daughter; noting that factors to be considered might include but should not be limited to the length of the alleged period of time in relation to the number of

individual criminal acts alleged; the passage of time between the alleged period for the crime and defendant's arrest; the duration between the date of the indictment and the alleged offense; and the ability of the victim or complaining witness to particularize the date and time of the alleged transaction or offense; in assessing "the ability of the victim or complaining witness to particularize the date and time of the alleged transaction or offense," the New York Court of Appeals considered the age of the victim a substantial factor, noting that "[i]t is not disputed that [ ] young victims [are] unable to provide the precise dates and hours involved."); *People v. Peters*, 187 A.D.2d 883, 590 N.Y.S.2d 916 ; *People v. Glover*, 185 A.D.2d 458, 585 N.Y.S.2d 873 (App. Div. 3d Dept. 1992); *Grady v. Artuz*, 931 F. Supp. 1048, 1065 (S.D.N.Y. 1996); *People v. Campbell*, 17 A.D.3d 925, 926-27, 793 N.Y.S.2d 647, 648 (App. Div. 3d Dept. 2005) ("While defendant cogently adds that counsel should have requested a bill of particulars specifying the dates and times of the alleged offenses, we note that counsel effectively cross-examined the victims regarding their uncertainty as to dates and times and, thus, defendant is unable to show any prejudice[.]") (citations omitted); *see also United States v. Young*, No. 08-CR-285 (KMK), 2008 WL 4178190, *2 (S.D.N.Y. Sept. 4, 2008) (noting that the Second Circuit "has consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms.") (quotation and citations omitted).

## 2.)     Introduction of Evidence of Uncharged Criminal Conduct

Burch faults trial counsel for eliciting proof as to uncharged crimes (i.e., other incidents on which Burch allegedly had molested the complainant) during his cross-examination of her, *see* T.238-40, and the prosecution's medical expert witness, Dr. Daniels. Burch argues that there

was no reason to do so, given that trial counsel was defending an indictment alleging only one count of sexual abuse. *See*, *e.g.*, Petitioner's Appellate Brief at 15-16.

As noted above, defense counsel intentionally questioned the complainant about other occasions, not specified in the indictment, on which Burch allegedly touched her in a sexually inappropriate manner. Prior to the close of the proofs, the trial court *sua sponte* brought up the issue of trial counsel's introduction of these instances of uncharged criminal conduct, noting that this case "deal[t] with a single count indictment shortly after Valentine's Day in 1997," and that there had been "no *Ventimiglia* notice[8] regarding charging criminal conduct or other acts against the same child," The court stated,

> And I realize counsel has tried the case before and I haven't, so I'm making a record as to my observations. There are certain evidentiary issues which I would possibly have had to resolve upon objection of the parties regarding the uncharged criminal conduct and with respect to this last witness [Dr. Daniels, the examining physician], his description of the chronic nature of the activities that the child has experienced. But I note that as a matter of tactics, [defense counsel] himself brought out the prior occasions on cross-examination [of the victim] this morning, and I understand that it cuts both ways.

> I'm just indicating to you that I recognize certain evidentiary issues have been waived as a matter of trial tactics, and since I have not been called to rule on them, I have not done so.

> However, . . . we're still going to be dealing with a single criminal act alleged to have happened shortly after Valentine's Day, and the jury will be charged as [sic] a single criminal act and not as any chronic behavior on the part of this defendant. So if either party cares to be heard. . . . I'm saying nobody made the objection. I haven't made any rulings of law in this area.

T.293-95. The prosecutor noted that he deliberately had not made an objection. Defense counsel observed no more than that the trial judge had "well stated the situation." T.296.

---

[8]     *People v. Ventimiglia*, 52 N.Y.2d 350 (N.Y. 1981).

Respondent argued on appeal that soliciting information about other alleged sexual acts between petitioner and the victim "clearly was a calculated decision made to further his trial strategy that the victim was fabricating the allegations." People's Appellate Brief at 15. Trial counsel argued during summation that the victim's inability to recall and failure to recount the other alleged incidents until *after* she was reminded of them was an indication that the incidents did not actually occur. *Id.* (citing T.578). In finding that, under the "totality of the circumstances," Burch received "meaningful representation," the Appellate Division did not address this contention specifically. Still, the court's failure to do so does not mean that it did not consider and reject the claim on the merits.

"The conduct of examination and cross examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *Eze v. Senkowski*, 321 F.3d at 127 (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (citing *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (no ineffective assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution witnesses because decisions as to nature and extent of cross-examination are strategic); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and will not support an ineffective assistance claim)). It is good practice for defense counsel to inquire into a witness's bias or motive to testify on cross-examination; such inquiries do not support a finding of prejudice under *Strickland*."). As the Supreme Court and Second Circuit have repeatedly instructed, reviewing courts are not to "not [to] second-guess trial counsel's defense strategy simply because the chosen strategy has

failed[,]" *United States v. DiTommaso*, 817 F.2d 201, 215 (2d Cir. 1987), and "[a]n advocate must be given some latitude in deciding upon an appropriate trial strategy[,]" *United States v. Helgesen*, 669 F.2d 69, 72 (2d Cir.1982).

The Second Circuit has observed that "[t]he question of prejudice under *Strickland* ordinarily entails consideration of the range of strategies and tactics available to a lawyer," and "[o]n that basis, in case after case," it has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." ) (citing *Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir. 1996) (citing *United States v. Tarricone*, 21 F.3d 474, 476 (2d Cir.1993) (decision to forgo testimony of handwriting expert); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (decision to forgo opening statement), *cert. denied*, 484 U.S. 957 (1987); *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir.1986) (questioning by defense counsel that "opened the door" to damaging evidence), *cert. denied*, 480 U.S. 908 (1987)).

It appears that trial counsel, through questioning the complainant about other instances of unreported sexual contact between her and petitioner, was attempting to show that the complainant was old enough to have acquired the skills of prevarication and manipulation. He pointed out that she had been in trouble at home and school for lying, and argued that she motives for retaliating against Burch. During summation, he attempted to utilize the victim's inability to recall details about the different incidents, and hesitation in answering questions about when and where they occurred to show that she had fabricated the charges against Burch and that her inconsistencies demonstrated that she was lying. Thus, counsel relied on the common-sense proposition that if one tells the truth, then one's story should be consistent from

one re-telling to the next; one does not have to worry about one's story changing over time. *See Williams v. McCoy*, 7 F. Supp.2d 214, 222 (E.D.N.Y. 1998) ("Here, the trial testimony of Santiago, the victim and principal witness, was inconsistent at points with her previous statements to the police and to medical personnel. Thus, competent evidence establishing that Santiago had a motive to fabricate may have created a reasonable doubt. Petitioner has failed to demonstrate, however, how any of the evidence excluded by the trial judge was material to his defense.").

Although reviewing courts must be loathe to second-guess trial counsel on matters of strategy, I am concerned that under the particular circumstances of this case, the decision to elicit uncharged instances of sexual abuse against the same victim went beyond merely risky, unorthodox, or ill-advised to being objectively unreasonable and prejudicial to petitioner. In addition to eliciting the uncharged crimes during cross-examination, defense counsel highlighted that conduct during summation in an attempt to further his misguided strategy: "[W]hen [the complainant] stood up there and gave her first account of this thing, I reminded her, I asked her if she had been kissed anywhere else. I had to remind her of her prior allegation that she had been kissed on the vagina." T.578. The victim did *not* testify on direct examination the Burch had kissed her vagina. Indeed, there was *no* proof whatever before this jury of any prior allegations by the victim that Burch had engaged in oral sexual contact with her–until trial counsel introduced it. Perhaps such an accusation had come up during the previous family court proceedings. That is immaterial, however, since the jury which was deciding Burch's guilt or innocence was not aware that the victim had made any prior allegations of oral sodomy against Burch. I cannot help but conclude that it was professionally inexcusable for defense counsel

provide the jury with a basis on which it could infer propensity on Burch's part to sexually abuse his step-daughter when there were other, more effective and less risky ways, for the defense to impugn her credibility–such as by cross-examining the psychological expert, Dr. Bongiovanni, as discussed below. As noted above, I need not decide whether this error alone would have rendered counsel's performance constitutionally deficient because *Strickland* instructs that I must assess the cumulative effect of all of counsel's errors in light of the entire evidentiary picture. *Lindstadt*, 239 F.3d at 204 (citing *Strickland*, 466 U.S. at 695-96). This particular error, considered with the additional errors discussed *infra*, "cumulatively, . . . underscores a fundamental lack of formulation and direction in presenting a coherent defense." *Stouffer v. Reynolds*, 168 F.3d 1155, 1163-64 (10th Cir.1999) (cited with approval in *Lindstadt*, 239 F.3d at 204).

### 3.) Failure to Adequately Cross-Examine the Prosecution's Medical Expert

As his third ground for relief, petitioner contends, defense counsel failed to confront Dr. Daniels with prior inconsistent statements made during the earlier family court proceeding. In the instant case, Burch contends only that defense counsel Nihoul failed to adequately cross-examine the prosecution's medical expert witness, Dr. Daniels, who testified regarding the physical findings from the gynecological examination of the complainant.

Here, Burch only contends that defense counsel, by failing to obtain the transcript of the family court proceeding, failed to impeach Dr. Daniels with a purportedly inconsistent prior statement. Burch has attached a page from the transcript of the family court proceeding in which the victim's mother's attorney asked Dr. Daniels whether the "symptoms [he] discovered within [the victim] be attributable to masturbation?" R.160. Dr. Daniels answered, "Could they be,

yes." *Id.*, Burch claims that when asked the "same question" during the criminal trial, Dr. Daniels responded, "No, it would have been too painful." Pet'r Appellate Brief at 14, R.16 (citing T.291). The Court has reviewed the page from the family court transcript submitted as an exhibit by petitioner's habeas counsel, and does not find the reference cited. Furthermore, as the state points out, there does not appear to be any inconsistency. Stated another way, Dr. Daniels gave an answer that was consistent with the same question and answer put forth at the family court proceedings. During his cross-examination at the April 28, 1998 trial, defense counsel asked Dr. Daniels, "Could [the victim] have caused this kind of injury to herself?" T.288-89. Dr. Daniels responded, "I imagine she could have. It would have been very painful. I suppose she could have." T.289. Defense counsel's follow-up was, "The initial time?" And Dr. Daniels conceded, "Yeah. Yes." *Id.*

I note that Burch never claimed in the state courts, and does not claim here, that defense counsel was ineffective in failing to consult with or retain a medical expert witness of his own. *See Gersten*, 246 F.3d (holding that defense counsel's failure to consult a medical expert "was not justified as an objectively reasonable strategic choice" as "no facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession." *Id.* (trial counsel in *Gersten* basically conceded that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case.). In *Gersten*, petitioner presented affidavits, and the district court heard testimony from, a doctor who called into question nearly all of the conclusions reached by the prosecution's medical expert at trial. In the habeas proceeding, Gersten's medical expert opined that the "prosecution's physical evidence was not indicative of sexual penetration and

provided no corroboration whatsoever of the alleged victim's story." *Id.* at 608.

Here, unlike *Gersten*, defense counsel did not concede the medical evidence. Moreover, it appears that defense counsel Nihoul was aware that the doctor's medical testimony (that there was chronic vaginal penetration) was not strongly corroborative of the victim's version of events or the indictment (that the sexual abuse by forcible vaginal penetration happened on one occasion). He attempted to exploit those discrepancies during his summation; however, as discussed elsewhere in this Decision and Order, he inadvertently undermined his own strategy by eliciting from the complainant additional occasions on which Burch allegedly molested her. Moreover, cross-examination of a medical expert in a child sexual abuse case by a defense attorney who has not even consulted with a medical expert of his or her own has been found to be insufficient to protect a defendant's Sixth Amendment rights. *See*, *e.g.*, *Lindstadt*, 239 F.3d at 202 (petitioner argued that counsel was ineffective because he "made no challenge to the only physical evidence that the prosecution introduced"; the circuit court found that there was "no evidence that defense counsel contacted an expert, either to testify or (at least) to educate counsel on the vagaries of abuse indicia"; conducted no relevant research of his own; and failed "even to request copies of the underlying studies relied on" by the prosecution's medical expert) (citing, *inter alia*, *Knott v. Mabry*, 671 F.2d 1208, 1212-13 (8th Cir.1982) (noting that counsel may be found to be ineffective for failing to consult an expert where "there is substantial contradiction in a given area of expertise," or where counsel is not sufficiently "versed in a technical subject matter . . . to conduct effective cross-examination.").

### 4.) Failure to Cross-Examine the Prosecution's Psychological Expert Called as a Rebuttal Witness

Petitioner's fourth alleged error relates to defense counsel's failure to cross-examine the

prosecution's rebuttal expert witness, Dr. Bongiovanni, who was presented with several

hypothetical examples and gave testimony as to "Child Abuse Accommodation Syndrome" in an

attempt to explain inconsistencies in the victim's testimony regarding the chronology of the

abuse, inability to provide details of the sexual contact, her delayed disclosure of the abuse, and

her subsequent friendliness and lack of distrust or fear of the alleged perpetrator. On the facts of

the present case, I find that the failure to cross-examine the prosecution's psychological expert

called in rebuttal was "an independent and sufficient indication of deficiency," *Gersten v.*

*Senkowski*, 299 F. Supp.2d 84, 105 (E.D.N.Y. 2004), *aff'd* 426 F.3d at 611-14 (2d Cir. 2005).

During oral argument on the first C.P.L. § 440.10 motion, the trial judge was particularly

concerned with this omission by defense counsel Nihoul. Judge Noonan closely questioned the

district attorney, James Subjack, as follows:

| | |
|---|---|
| The Court: | Let me ask you this, Mr. Subjack [the District Attorney]. Taking only the purpose to which Dr. Bongiovanni was called at the criminal trial and not expanded to the other areas I discussed with Mr. Fagan, the essence of a psychologist's testimony on child sexual abuse accommodation syndrome is, for lack of a better way of saying it, things are not as they appear, ladies and gentlemen of the jury. |
| Mr. Subjack: | Correct. |
| The Court: | Now, would you agree with me that a defense attorney should stand up and cross-examine that psychologist and say that things are as they appear or that they could be as they appear, couldn't they, Doctor? If you boil child sexual abuse accommodation syndrome down to its elements, the delayed disclosure is not inconsistent with sexual abuse. Friendliness with the perpetrator is not inconsistent with sexual abuse, and the inconsistency in relating the story is not inconsistent with being a victim of sexual abuse. Shouldn't defense attorneys stand up and say that if the child had promptly disclosed it, you would have said that's not inconsistent, too, wouldn't you Doctor? And if the child had been consistent, you'd say that's indicative of sexual abuse, isn't it Doctor. I mean, shouldn't those questions have been asked of Dr. Bongiovanni and if so, does that rise to the level of ineffective |

|                | assistance of counsel? |
|----------------|------------------------|
| Mr. Subjack:   | If you are asking the question would I have asked some of those questions, I certainly would not have asked all of them. Some of them, perhaps, I would. |
| The Court:     | Not you but - - we're talking about a standard of assistance that the defendant is entitled to the constitutional standard of representation and we're at a critical stage of the proceedings. There have been, as there are in all child sexual abuse trials, lots of inconsistency, lots of different versions of what has occurred and why people do things and the last witness in this case is a witness that stands up and says that none of these things are inconsistent with the child having been a victim of child sexual abuse and as we all know, that is admissible, the [New York] court of appeals has so held. Isn't the defendant entitled to an attorney who is going to stand up and ask the other side of all of those coins to try to lessen or minimize or perhaps obliterate the effectiveness of Dr. Bongiovanni's testimony? |
| Mr. Subjack:   | Any defendant is entitled to the most effective assistance of counsel he or she is able to obtain. We can't get into attorney shopping and say this attorney is not as good at cross-examination or this attorney is better. We are talking about assigned counsel. They've all been deemed as competent. I say this is going to an issue of trial strategy. He chose not to perhaps grace the words of Dr. Bongiovanni by expounding upon them further during the course of cross-examination. Perhaps the indication that he wished to give was that his testimony was so far afield . . . that it should be held to such derision and scorn and that it's unworthy of further cross-examination. . . . |

Record of Post-Conviction Proceedings at 111-13.

However, Judge Noonan, in a written decision and order entered October 8, 1998, then rejected Burch's claims of ineffective assistance and denied the C.P.L. § 440.10 motion. In his decision, he stated that "[t]he one area of defendant's trial counsel's performance which is of concern to the Court" was counsel's failure to cross-examine Dr. Bongiovanni, the rebuttal expert witness, who "rendered the opinion that the conduct attributed to the victim in the days, weeks and months following her alleged sexual abuse was not inconsistent with having been sexually abused." C.P.L. § 440.10 Order at 6, R.129. Although Judge Noonan rejected

petitioner's contention that such testimony would have opened the door to a full cross-examination of all of the issues to which Dr. Bongiovanni testified in family court, he agreed that trial counsel could have "fully explored through cross-examination the weaknesses inherent in testimony about the Child Sexual Abuse Accommodation Syndrome, and *inexplicably declined to do so*." *Id.* (emphases supplied). Judge Noonan observed, "There is no question that the rebuttal testimony offered by Dr. Bongiovanni was powerful in its content, refuting defense contentions that the child's conduct was inconsistent with having been sexually abused by the defendant, and in its [the testimony's] recency [in that it was immediately] prior to the case being submitted to the jury." *Id.* The trial court did not seem persuaded by the state's contention that the "defense decision not to cross-examine the doctor could well have been trial strategy so as not to further punctuate or strengthen the doctor's testimony . . . ." C.P.L. § 440.10 Order at 6, R.129.

Despite finding it "inexplicable" that attorney Nihoul's declined to challenge the rebuttal expert, the trial court nevertheless found that "the evidence, the law and the circumstances of this particular case viewed in their totality, and as of the time of the representation, satisfie[d] [it] that the Constitutional requirement of effective assistance has been met." *Id.* at 7, R.130. Regrettably, however, the trial court did not elaborate as to *why* "the  evidence, the law and the circumstances" of Burch's case convinced it that trial counsel had performed in a constitutionally effective manner. *See id.* The trial court noted only that "the defendant used a similar strategy and hung the jury in a previous trial[,]" making it "difficult to conclude that trial counsel's strategy was not a reasonable one . . . ." *Id.*, R.130.

The Court has reviewed the trial record in its entirety several times and must conclude

that the state courts, were objectively unreasonable in determining that concluding that Burch received the effective assistance of counsel, notwithstanding attorney Nihoul's conceded and significant error as set forth below. The state courts unreasonably applied clearly established federal law as set forth in both prongs of the *Strickland* two-part test and, moreover, their conclusions were objectively unreasonable in light of the facts as developed on the record below.

### a.) Deficiency of counsel's performance

Turning first to *Strickland*'s deficient performance prong, I find that the state courts were objectively unreasonable to the extent they accepted the proposition, as put forth by the prosecution, that trial counsel had a reasonable strategy in failing to challenge the psychological expert's rebuttal testimony on cross-examination. The Supreme Court has explained that since the fundamental purpose of the Sixth Amendment's counsel clause is "to ensure a fair trial," the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686. Because "the adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate[,]'" *Anders v. California*, 386 U.S. 738, 743, 87 S.Ct. 1396, 1399, 18 L.Ed.2d 493 (1967)[,] [t]he right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). *See also*, *e.g.*, *Kentucky v. Stincer*, 482 U.S. 730, 737 (1987) ("The right to cross-examination, protected by the Confrontation Clause, thus is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial"); *Maryland v. Craig*, 497 U.S. 836, 845 (1990) ("The central

concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact"); *cited in Crawford v. Washington,* 541 U.S. 36, 60-61 (2004) (observing that the Sixth Amendment "commands, not that evidence be reliable, but that reliability be assessed . . . by testing in the crucible of cross-examination . . ."). As long-standing Supreme Court precedent makes clear, the importance of cross-examination to the adversarial process in a criminal trial cannot be overstated. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). As the Supreme Court expressed the notion: "[T]he truthfinding process is better served if the witness' testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.'" *Briscoe v. LaHue*, 460 U.S. 325, 333-34, (1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 440 (1976) (White, J., concurring in the judgment)).

Recently, a number of habeas courts have determined that no reasonable strategy supported trial counsel's considered decision, in a criminal prosecution for child sexual abuse, not to consult with or present an expert witness for the purposes of challenging the opinions offered by the prosecution's medical experts concerning the medical evidence of sexual abuse and/or psychological experts with regard to psychological matters pertaining to victims of such abuse. *See, e.g., Gersten v. Senkowski*, 426 F.3d at 607-14; *Lindstadt v. Keane*, 239 F.3d at 202-04; *Byrd v. Trombley*, 580 F. Supp.2d at 557-61. Notably, in the present case, defense counsel

not only failed to consult with or present a psychological expert witness to counter Dr. Bongiovanni's rebuttal testimony, he failed to conduct *any* cross-examination whatever of Dr. Bongiovanni. This was objectively unreasonable in light of professional norms of attorney practice.

In *Gersten v. Senkowski*, 299 F. Supp.2d 84 (E.D.N.Y. 2004), *aff'd*, 426 F.3d 588 (2d Cir. 2005), the petitioner had been convicted on multiple counts of sodomy, sexual abuse, and endangering the welfare of the child with regard to his daughter. At his state court bench trial, the prosecutor presented a psychologist as an expert witness who "offered [his] testimony to explain why the daughter did not accuse her father of sexual abuse until she was thirteen years old, eight years after [the abuse] allegedly began." 299 F. Supp.2d at 105. The district court in *Gersten* found that the psychologist's testimony on Child Sexual Abuse Accommodation Syndrome "bolstered the daughter's credibility" and trial counsel's cross-examination of the expert "was pallid, showing no grasp of the scientific predicates for the testimony." *Id.* Furthermore, the district court found,

> In failing to call an expert witness to rebut the [Child Sexual Abuse Accommodation Syndrome] testimony, trial counsel missed another critical opportunity to damage the daughter's credibility. There is no sound trial strategy that would justify this deficiency.

*Gersten*, 299 F. Supp.2d at 105. The Second Circuit agreed that the defense attorney in *Gersten* was ineffective for failing to consult with or consult an expert on the psychology of child sexual abuse victims to rebut the prosecution's psychologist's testimony offered "in order to bolster the alleged victim's credibility, primarily by explaining her failure to reveal the abuse earlier and her inability to provide a consistent detailed account of the abuse." *Id.* at 611; *se also Gersten*, 299 F. Supp.2d at 105. Due to his failure to consult or retain a psychological expert, trial counsel in

*Gersten* was "unable to mount an effective cross-examination, and missed an opportunity to rebut this attempt at bolstering the alleged victim's credibility." *Id*. Given that "the prosecution's case rested on the credibility of the alleged victim," *Gersten*, 426 F.3d at 611, and "[a]ll other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of the alleged victim's story," the "lack of preparation and failure to challenge the credibility of the key prosecution witness could not be based on a sound trial strategy, and it was an unreasonable application of *Strickland* for the [trial] [c]ourt to hold otherwise." *Id*. at 611.

Similarly, in *Byrd v. Trombley*, the prosecution called a psychologist who evaluated the victim after the incident was reported, and who opined that the victim's "testimony, symptoms, and behavior in the courtroom were consistent with her having been the victim of sexual abuse." 580 F. Supp.2d 542, 558 (E.D. Mich. 2008) (report and recommendation adopted) (citations to record omitted). Defense counsel in that case conducted no independent investigation with regard to the psychologist's testimony. *Id*. The district court rejected the state court's conclusion that the decision not to present expert testimony on these matters was a strategic decision, reasoning that counsel could not have made a reasonable strategic decision not to call experts because he never even explored that option. *Id*. at 558 (citing *Strickland*, 466 U.S. at 691). Thus, the court in *Byrd* found that "[t]he failure to even consult an expert violated counsel's duty to conduct a reasonable, diligent investigation of the case." *Id*. (citing *Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *Gersten v. Senkowski*, 426 F.3d at 607 ("failure to consult with or call a medical expert" is "particularly" indicative of ineffective assistance "where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness

testimony"); *Eze v. Senkowski*, 321 F.3d at 128 (noting that the "importance of [expert] consultation and pretrial investigation is heightened where, as here, the physical evidence is less than conclusive and open to interpretation"). The district court in *Byrd* concluded that the Second Circuit's reasoning "applies equally to situations involving expert child abuse victim profile testimony." 580 F. Supp.2d at 558; *accord, e.g.*, *Gersten v. Senkowski*, 426 F.3d at 611-13.

As was true in *Gersten* and *Byrd*, here the prosecution's "entire case rested on the credibility," 426 F.3d at 612, of the victim, and "[a]ll other evidence presented by the prosecution was indirect evidence offered to corroborate aspects of the alleged victim's story[,]" *id. See also Byrd*, 580 F. Supp.2d at 558. Also as was the case in *Gersten* and *Byrd*, the prosecutor at Burch's trial offered its psychological expert's testimony in rebuttal, "in order to bolster the alleged victim's credibility, primarily by explaining her failure to reveal the abuse earlier and her inability to provide a consistent and detailed account of the abuse." *Gersten*, 426 F.3d at 611. It is true that Dr. Bongiovanni did not give an opinion that the complainant's behavior, *in particular*, could be explained by Child Sexual Abuse Accommodation Syndrome. Given the facts in the prosecution's hypothetical examples, however, his opinion was clearly apparent and would be readily inferred by an reasonably aware juror.

Indeed, during oral argument on the C.P.L. § 440.10 motion, the trial court enumerated various concessions that defense counsel could have, and should have elicited from Dr. Bongiovanni: For example, the trial court pointed out, Dr. Bongiovanni opined that delayed disclosure of abuse is not inconsistent with sexual abuse. The trial court asked whether a reasonably competent defense attorney should have elicited from the expert that if the

complainant had promptly disclosed it, then he would have stated that prompt reporting likewise is not inconsistent with sexual abuse.[9] Here, the trial court recognized the inexplicability of defense counsel's purposeful omission, but inexplicably found that trial counsel's error was not of a constitutional magnitude. Another unfathomable aspect of defense counsel's dismal and wholly inadequate performance is that he believed that Dr. Bongiovanni's testimony was not going to be admissible. When the parties were discussing rebuttal witnesses, the trial judge stated that "at a sidebar, Mr. Nihoul indicated to me that Dr. Bongiovanni had testified in Family Court and had testified that he did not believe in the Child Sexual Abuse Accommodation Syndrome." T.553. Attorney Nihoul explained that he had asked him that question in family court, and he stated that "there is no behavior exhibited by sexual abuse victims that might not be explained by some other extraneous factor, therefore, he did not testify to it and he did not offer an opinion or explanation of any behavior." T.553. Nihoul asserted that based on that prior statement (which he had not had transcribed), he "expect[ed] that would . . . eliminate any admissibility of [Dr. Bongiovanni's] testimony." T.553-54.

However, defense counsel was utterly mistaken in his assertion that the doctor's testimony would not be admissible. Even if he believed that to be the case, it was must have become clear to him once Dr. Bongiovanni testified that this was an incorrect assumption. Based upon his unreasonable belief that Dr. Bongiovanni's testimony was not going to be admissible, trial counsel made no *in limine* motion in advance of the testimony to exclude it. As a consequence, all of Dr. Bongiovanni's opinion testimony was admitted. As set forth above, the

---

[9]    Judge Noonan specifically asked the prosecutor at oral argument, "[W]ould you agree with me that a defense attorney should stand up and cross-examine that psychologist and say that things are as they appear or that they could be as they appear, couldn't they, Doctor [Bongiovanni]?" . . . [S]houldn't those questions have been asked of Dr. Bongiovanni and if so, does that rise to the level of ineffective assistance of counsel?" R.111-12.

prosecution presented Dr. Bongiovanni with "hypothetical" factual scenarios that mirrored exactly the factual circumstances of the case against Burch . The "hypothetical" victim displayed all of the same traits and behaviors as the real complainant in this case. Dr. Bongiovanni then was permitted to explain away all of the complainant's incongruities and inconsistencies by reference to the Child Sexual Abuse Accommodation Syndrome, and thereby eviscerated the core theory of the defense. Defense counsel's failure to cross-examine Dr. Bongiovanni, or at least object to his expansive narration, is inexcusable, and the Court is confident that no explanation could possibly redeem this mistake in an overall substandard performance. This failure to challenge the expert psychological testimony highlights even more the level of trial counsel's incompetence, given that he stated that he had previously confronted Dr. Bongiovanni at the family court proceeding and supposedly elicited an admission that Dr. Bongiovanni *did not believe* in Child Sexual Abuse Accommodation Syndrome. Dr. Bongiovanni then testified at petitioner's trial that Child Sexual Abuse Accommodation Syndrome was a psychiatrically and psychologically valid syndrome, recognized by himself as well as other unnamed professionals who purportedly had a great deal of experience in the field.

In *Gersten*, the court found that by failing to consult with or call an expert on the psychology of child sexual abuse victims, trial counsel "was unable to mount an *effective* cross-examination, and missed an opportunity to rebut" the prosecution's "attempt at bolstering the alleged victim's credibility." *Id.* (emphasis supplied). Here, trial failed to mount *any* cross-examination of the psychological expert. He deliberately abandoned his only opportunity to obtain admissions from Dr. Bongiovanni that could have undermined the victim's credibility and veracity and provided needed support for the defense theory that the victim was not telling the

truth. In a case such as this one, where the credibility of the victim was the core defense, where there were no third-party witnesses, where there was a paucity of physical evidence, trial counsel's failure to challenge the complainant's credibility "could not be based on a sound trial strategy, and it was unreasonable application of *Strickland* for the County Court to hold otherwise."*Gersten*, 426 F.3d at 611. *Accord Byrd*, 580 F. Supp.2d at 558 (citing *Gersten*, 426 F.3d at 610-11; *Pavel v. Hollins*, 261 F.3d at 222-25; *Holsomback v. White*, 133 F.3d at 1387-88).

I note that one factor distinguishing *Gersten* and *Byrd*, for example, from the instant case is that the petitioners in those cases presented to the habeas court affidavits from psychological experts dismantling the scientific validity of Child Sexual Abuse Accommodation Syndrome in general, *Gersten*, 426 F.3d at 611; *Byrd*, 580 F. Supp.2d at 559-60; and attacking the prosecution experts' methodologies and conclusions in particular, *id*. Here, Burch has not done so. I do not read those decisions as holding that offering such evidence a prerequisite to granting relief and, in any event, this case deals with the complete failure to mount *any* cross-examination, not merely the failure to prepare adequately to perform an effective cross-examination. And, as discussed in the following section on the prejudice created by counsel's shortcomings, cross-examination of a psychological expert witness without the benefit of expert advice was not enough to save counsel's performance from being constitutionally deficient in several recent habeas cases. *See Gersten*, 426 F.3d at 611-12; *Byrd*, 580 F. Supp.2d at 559-61.

### b.)    Prejudice

As noted above, *Strickland*'s prejudice prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different," 466 U.S. at 694; *accord*, *e.g.*, *Gersten*, 426 F.3d at 611. The

Supreme Court has defined "reasonable probability" as "a probability sufficient to undermine

confidence in the outcome." *Id.* When assessing the amount of prejudice that accrued to the

petitioner, courts "look to the cumulative effect of all of counsel's unprofessional errors."

*Gersten*, 426 F.3d at 611 (citing *Lindstadt v. Keane*, 239 F.3d at 204; *accord*, *e.g.*, *Daniels v.*

*Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005); *Floyd v. Hanks*, 364 F.3d 847, 850 (7th Cir.

2004); *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003). A verdict "only weakly supported

by the record is more likely to have been affected by [counsel's] errors[,]" *Strickland*, 466 U.S.

at 696, while, "[c]onversely, where there is overwhelming evidence of guilt, even serious errors

by counsel will not warrant granting a writ of habeas corpus[,]" *Gersten*, 426 F.3d at 611 (citing

*Lindstadt*, 239 F.3d at 204); *see also Strickland*, 466 U.S. at 695 (courts "must consider the

totality of the evidence before the judge or jury); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 17 (6th

Cir. 2005) ("[T]he prejudice determination is necessarily affected by the quantity and quality of

the other evidence against the defendant.").

　　　As Burch's previous trial ended in a hung jury, with the jurors reputedly voting 8 to 4 for

acquittal, *see* Peo. App. Br. at 1, R.34,  it is reasonable to conclude that the jurors did not find the

prosecution's proof against Burch to be overly compelling. *Accord Byrd v. Trombley*, 580 F.

Supp.2d at 559 ("The case against petitioner was not particularly strong, as evidenced by the fact

that two prior trials ended in hung juries."); *see also Lindstadt v Keane*, 239 F.3d at 205

(characterized as "a case of underwhelming evidence" where the only direct evidence against

petitioner consisted of the eyewitness testimony of the victim); *Gersten*, 426 F.3d at 612

(prosecution presented the victim's eyewitness testimony, corroborative testimony from the

victim's mother and the medical expert who examined her, and bolstering testimony from an expert on child psychology; holding that evidence against petitioner was "no stronger than it was in *Lindstadt*"). In terms of the quantum of evidence, as I have noted above, the prosecution's case consisted entirely of the victim's testimony, the medical evidence of the "callousing" of her vaginal opening, and Dr. Bongiovanni's testimony giving an explanation for why the victim's behavior was not inconsistent with having been sexually abused. *Accord*, *e.g.*, *Byrd*, 580 F. Supp.2d at 559; *Gersten*, 426 F.3d at 612. There was "no objective evidence to support an inference that any crime took place at all," 426 F.3d at 612, and "no physical evidence [such as semen, etc.] linking petitioner to any crime that occurred," *id.* Apart from the testimony offered by the victim, the prosecution's medical expert witness (whose conclusions were not challenged by an opposing expert witness and were made more damaging by an aimless and inept cross-examination by trial counsel), actually was not strongly corroborative of the crime charged. *See id.* Dr. Daniels testified that the victim's hymen appeared to be "calloused from chronic penetration" of the vagina; the penetration had to have occurred "many" or "multiple times over a course of a fairly decent amount of time" in order to produce the physical symptoms he found. Dr. Daniels estimated that the minimum number of penetrations that could have caused the condition seen in the victim was "four or five times over the course of about two to three weeks." Dr. Daniels conceded that it was possible, but less likely, that the injury would have happened after only two or three times. Significantly, however, the indictment alleged only *one* instance of aggravated sexual abuse by Burch. Thus, defense counsel, by soliciting testimony from the victim that Burch had molested her on three or four other occasions by inserting his fingers into her vagina, helped to corroborate Dr. Daniels' findings of injury by "chronic vaginal

introduction," whether the doctor was correct or not.[10]

It bears emphasis that this was a case where the medical evidence did not closely correlate with the one-count indictment or the victim's story as elicited during the prosecution's direct proof. Thus, rather than undermining the victim's credibility, testimony that petitioner penetrated the victim's vagina on several occasions rather than just once had the effect of bolstering the medical evidence. It is no wonder that the prosecution did not object to this line of questioning. Moreover, defense counsel elicited potentially inflammatory testimony when he brought in the other alleged instances of abuse; the victim related that not only did Burch insert a finger in her vagina, but his molestation of her had progressed to oral-genital contact. Defense counsel obtained a concession from the victim that Burch had only sodomized her once, but the Court harbors doubts that this ameliorated the potential prejudice of the uncharged crimes evidence.

As the Second Circuit found in *Gersten*, "Not only was the evidence against petitioner relatively thin, but most of it could have been, but was not, effectively challenged by defense experts or an informed cross-examination." *Id.*; *see also Byrd*, 580 F. Supp.2d at 559-60. Furthermore, the prosecution's only other evidence (i.e., Dr. Bongiovanni's psychological testimony) was offered to bolster the victim's credibility. *Id.*

I note that defense counsel did argue during summation that the jury should not infer from Dr. Bongiovanni's testimony that the victim's behavior was consistent with someone who has experienced sexual abuse. Rather, defense counsel urged the jury to draw the opposite

---

[10]    *See also* T.578. During his summation, trial counsel asserted that the victim's "account was sketchy" and "incomplete." He stated, "We still don't have a clear idea of how many number of incidents, where they took place, when they took place and exactly what happened. Was it day or night? Was it three or four times? Was it five or six times? We don't know. . . ." T.578.

conclusion–that the victim's delay in reporting, inability to describe the details of the alleged abuse, and friendliness with Burch in the months following the incident, were more consistent with no sexual abuse having occurred. However, trial counsel's partisan argument on behalf of his client, based solely on his own view on what was a "common sense" interpretation of the victim's behavior, was no match for the well-accredited Dr. Bongiovanni, to whose professional *bona fides* the prosecutor referred repeatedly during summation. *Cf. Byrd v. Trombley*, 580 F. Supp.2d at 559. In *Byrd*, the district court found trial counsel prejudiced his client by failing to investigate and present expert testimony to contradict the testimony provided by the prosecution's psychological expert. The state court of appeals in *Byrd* had found that there was no prejudice because trial counsel "conducted extensive cross-examination of each of the [expert] witnesses in an evident attempt to discredit their testimony." *Id.* (quotation omitted). The habeas court found that this determination was not reasonable in light of the evidence presented, *see* 28 U.S.C. § 2254(d)(2), because "[t]he few begrudging concessions which counsel was able to elicit from the prosecution's experts was no substitute for contradictory, scientifically grounded evidence which wholly contradicted their testimony." *Id.* The *Byrd* court found that nothing elicited by trial counsel on cross-examination approached the testimony that a defense psychological expert would have provided, as evidenced by the expert affidavits submitted in support of the habeas petition. 580 F. Supp.2d at 560. Because the entirety of the victim's case depended upon her testimony as supported by the medical expert and psychological expert testimony, a "properly called and examined expert . . . could have significantly undermined the objective expert testimony buttressing the victim's credibility in a way that cross-examination could not, and indeed did not, do." *Id.* (citing *Lindstadt*, 239 F.3d at

202).

Here, I note that unlike the petitioners in *Gersten* and *Byrd*, Burch's habeas counsel has not provided affidavits from any doctors who would have testified in a contrary manner to prosecution psychological expert Dr. Bongiovanni. However, also in contrast to those cases, Burch alleges an even more fundamental shortcoming on the part of defense counsel–the complete failure to attempt to discredit the prosecution's expert through cross-examination. By not bothering to cross-examine the prosecution's psychological expert at all, Burch failed to take advantage of the only opportunity to try to elicit even *any* concession, begrudging or otherwise, to which he could point during his summation argument that the victim's behavior was inconsistent with sexual abuse having occurred. And, in any event, the district court found in *Byrd*, trial counsel's cross-examination of the psychological expert without any preparation or consultation with a comparable defense expert was not sufficient to ameliorate the prejudice to petitioner. Surely, then, where there has been a total failure by counsel to at least cross-examine a prosecution's expert, the prejudice is even more acute and apparent. *Cf. Byrd*, 580 F. Supp.2d at 560-61; *Lindstadt v. Keane*, 239 F.3d at 202.

Here, after reviewing the trial transcript, I believe that Burch suffered substantial prejudice as a result of trial counsel's failure to consult with a psychological expert witness, educate himself on the weaknesses inherent in the so-called Child Sexual Abuse Accommodation Syndrome, and, at the very least, cross-examine the prosecution's psychological expert. As was true in the cases cited above, the entirety of the prosecution's case was founded on the victim's recounting of the abuse as supported by the medical expert and psychological expert testimony. However, the victim was unable to recall the date on which the incident

occurred and provided but few details, some of which were arguably inherently inconsistent. For instance, as defense counsel pointed out, the victim's description of how petitioner allegedly held the victim down by both shoulders while inserting a finger in her vagina arguably was not physically possible. The medical expert testified to the injuries being caused by "chronic vaginal introduction," which did not corroborate the indictment alleging one count of sexual abuse, or the victim's story, as elicited during the prosecution's direct proof, that Burch touched her on only two occasions. Under these circumstances, it was incumbent upon defense counsel to attempt to discredit and undermine the victim's credibility as much as possible, and there is no strategic reason for failing to make the most minimal efforts to do so by cross-examining the prosecution's psychological expert. Clearly, Dr. Bongiovanni's purpose was to bolster the victim's credibility and weaken the defense argument that the child's behavior throughout the episode was not consistent with having been a victim of sexual abuse but rather was the conduct of a manipulative and mendacious little girl. Indeed, the trial court did not accept the state's weakly proffered argument that the failure to cross-examine was a matter of strategy. *See* R.128-29. Moreover, the trial court found that Dr. Bongiovanni's rebuttal testimony in fact greatly damaged the defense; he stated there was "no question that the rebuttal testimony offered by Dr. Bongiovanni was powerful in its content, refuting defense contentions that the child's conduct was inconsistent with having been sexually abused by the defendant and in its [the testimony's] recency [in that it was given immediately] prior to the case being submitted to the jury." R.129. For the trial court nevertheless to conclude that defense counsel provided meaningful representation was an unreasonable application of the Supreme Court's precedent as articulated in *Strickland v. Washington*. Moreover, it was an unreasonable interpretation of the facts in light

of the evidence presented. *See Wilson v. Mazzuca*, 570 F.3d at 507 ("[W]e are unpersuaded that

[trial counsel] had any reasonable trial strategy, or that his actions and omissions did not unfairly

prejudice his client.").[11]  Accordingly, Burch is entitled to habeas relief on his ineffective

assistance of counsel claim.

### c.  Necessity of a *Sparman* Hearing

The Second Circuit has stated, "We believe that a district court facing the question of

constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer

the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form

of live testimony, affidavits, or briefs." *Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998)

(*per curiam*) (affirming district court's grant of writ of habeas corpus based on determination

that petitioner's counsel at his state trial had been constitutionally ineffective; noting with

approval that the district court held an evidentiary hearing at which trial counsel, charged with

ineffectiveness in the handling of petitioner's defense, testified) (emphasis supplied; citation

omitted); *see also Ramchair v. Conway*, No. 08-2004-pr, 2009 WL 1868031, at *1 (2d Cir. June

30, 2009) (unpublished opn.) ("The District Court granted Ramchair's petition for habeas based

on its finding that he received ineffective assistance of appellate counsel. In so holding, the

District Court concluded that appellate counsel should have raised the claim that the trial court

---

[11]       "In light of the weakness of the prosecution's case and the extent to which defense counsel's
errors bolstered the case against *Wilson*, it is 'reasonabl[y] probab[le] that, but for counsel's unprofessional errors,
the result of the proceeding would have been different.' *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. As the Supreme
Court explained in *United States v. Dominguez Benitez*, '[t]he reasonable-probability standard is not the same as, and
should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for
error things would have been different.' 542 U.S. 74, 83 n. 9, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (citing *Kyles
v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). A reviewing court looks instead to whether
'the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding.'
*Dominguez Benitez*, 542 U.S. at 83, 124 S.Ct. 2333 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Such is
the case here, and it was an unreasonable application of Strickland for the state court to conclude otherwise." *Wilson*,
570 F.3d at 507 (alterations in original).

erred in failing to grant Ramchair's motion for a mistrial. Though the District Court provides strong support for this conclusion, the District Court did not collect evidence from appellate counsel (nor explain that such evidence was unavailable) as to whether appellate counsel had a strategic reason for not bringing this claim. . . . . Because the District Court did not present such an opportunity [under *Sparman*], we instruct the [District] Court, upon remand, to conduct an evidentiary hearing to inquire from Ramchair's allegedly ineffective appellate counsel as to whether--if counsel can remember--there was a strategic reason for not raising the mistrial claim.").

Thus, before a habeas court issues a writ of habeas on the basis that trial or appellate counsel rendered constitutionally defective performance, the generally preferred course of action is to hold an evidentiary hearing to allow an allegedly ineffective attorney an opportunity to be heard and to present evidence, *Sparman*, 154. F.3d at 52; *see also Jackson v. Leonardo*, 162 F.3d 81, 86 (2d Cir.1998) (where the circuit court finds a *Strickland* violation, "the usual practice should be to remand . . . to the district court to permit the attorney in question to testify and explain her actions"). However, this case has a confluence of several peculiar circumstances that have rendered a *Sparman* hearing impracticable as well as unnecessary.

First, the impracticability–viz., the apparent disappearance of petitioner's trial counsel, who would be the chief witness at the *Sparman* hearing. As related above, in the time between the jury verdict and the sentencing hearing, trial counsel Nihoul left New York state, taking his client's entire file with him to Florida. Although he was still under an obligation to represent Burch, Nihoul failed to appear for the sentencing hearing. Thus, a new attorney, Peter Clark, Esq., who had no familiarity with the case, was assigned to represent Burch at sentencing.

Attorney Fagan, who was retained by Burch's family to perfect his direct appeal, and who took over representing Burch after sentencing, indicated to the trial court at the C.P.L. § 440.10 argument, that attorney Clark was able to get in contact with Nihoul at his sister's residence in Florida and obtain Burch's file via express mail prior to the sentencing. However, Attorney Fagan[12] indicates in his habeas pleadings, that Attorney Nihoul's present whereabouts are unknown. In conducting its own search on the Internet, this Court came across an Order issued on July 11, 2008, by the Appellate Division, Fourth Department, of New York State Supreme Court,[13] ordering Nihoul, among others, suspended from the practice of law in New York due to the failure to comply with attorney registration requirements–one of which is providing to the Office of Court Administration an updated address. Thus, Attorney Nihoul has made himself effectively unlocatable.

Furthermore, under the unique factual circumstances of this case, I find that a *Sparman* hearing is unnecessary. Specifically, After reviewing the available state court record in light of the relevant Federal law, the Court agrees that, as argued forcefully by petitioner's habeas counsel, no reasonable strategic considerations could account for the numerous, professionally deficient acts and omissions by defense counsel "'that had the effect of substantially strengthening the state's otherwise weak case,'" *Wilson v. Mazzuca*, 570 F.3d 490, 497 (2d Cir. 2009) (quotation omitted). Thus, "[w]hile it is fundamental that acts and omissions that could be considered sound trial strategy do not rise to the level of deficient performance under

---

[12]    Fagan has continued to represent Burch throughout his post-conviction proceedings and has filed the instant habeas proceeding on Burch's behalf.

[13]    *Matter of Attorneys in Violation of Judiciary Law § 468-1 and 22 NYCRR 118.1,* 54 A.D.3d 9, 860 N.Y.S.2d 412 (App. Div. 4th Dept. 2008).

*Strickland*," as discussed further above in this Decision and Order, there is nothing that trial counsel could say now that would convince any objective observer that the conduct of Burch's defense was objectively reasonable and that counsel's various omissions were grounded in a reasonable trial strategy.

I do not believe that under these unusual circumstances–namely, where trial counsel absconded from the state and abandoned his client, has been suspended from the practice of law for failure to comply with registration requirements, whose whereabouts are presently unknown; and whose ineffectiveness was so egregious and devoid of objectively reasonable strategy, and so plainly apparent upon the state court record–that it would be a prudent use of public funds or promote judicial economy to attempt to engage in a nationwide search for trial counsel and, assuming that the Court could make contact with him, bring him to this District to testify at an evidentiary hearing. Accordingly, the Court has declined to hold an evidentiary hearing in this case on the basis that it conforms to the "highly unusual circumstance exception" in *Sparman*.

### B.      Ground Two: Error by the trial court in charging the jury

As his second ground for habeas relief, Burch alleges incorrectly charged the jury as follows:

> This indictment charges the defendant, Lawrence Burch, with aggravated sexual abuse in the second degree alleging that *shortly after Valentine's Day, on or about February 14th or 15th*, . . . he inserted his finger into the vagina of another person, [the victim], causing physical injury to that person by forcible compulsion.

T.644; Pet'r App. Br. at 21, R.23. As Burch points out, the prosecution did not file a Bill of Particulars because trial counsel did not request one prior to trial, and the indictment itself allegedly only that the incident occurred in "February 1997." Pet'r App. Br, at 21-22, R.23-24.

Burch contends that the trial court improperly "put in dates to the charge that favored the Prosecution Rebuttal case, but were never a part of its case in chief." R.24.

As an initial matter, I note that it appears that this claim is unexhausted, as it has never been presented in federal constitutional terms to the state courts. Section 2254(b) provides in pertinent part that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b) (1988). "The exhaustion requirement is not satisfied unless the federal claim has been "fairly presented" to the state courts." *Daye v. Attorney Gen'l of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (citations omitted). "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the *legal premises* of the claim he asserts in federal court." *Id.* (citations omitted) (emphasis supplied). The only time petitioner raised this argument was on direct appeal, and the argument occupied less than a full page. Furthermore, Burch's appellate counsel did not cite any legal precedents (state or federal) and did not refer to any constitutional amendments; nor did he argue that petitioner was deprived of " particular right specifically protected by the Constitution." *Daye*, 696 F.2d at 192-93. Finally, petitioner did not describe his claim under the "very broad terms, such as denial of a 'fair trial'" (which, standing alone, has not been held to fulfill the fair presentment requirement) but nevertheless provide sufficient allegations so that no reasonable jurist would doubt that the defendant's claim implicated his constitutional right to due process of law. *Id.* at 193.

The claim, although technically unexhausted, should be "deemed" exhausted because Burch has no further avenues in state court by which he can seek redress; he has already utilized

the one direct appeal to which he is entitled, and if raised on collateral review in a C.P.L. §

440.10 motion, the trial court would be required to deny it since it unjustifiably was not raised on

direct appeal despite a sufficient factual record. *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir.

1991) (citing N.Y. COURT RULES § 500.10(a); N.Y. CRIM. PROC. LAW § 440.10(2)(c)). These

procedural rules which give rise to the constructive exhaustion of the claim also result in a

procedural default which bars further review unless Burch can show cause and prejudice, or that

he is actually innocent so that a fundamental miscarriage of justice will occur should this Court

decline to hear the claim. *Grey*, 933 F.2d at 120-21 (citations omitted).

Burch has not alleged cause or prejudice in his petition on this claim. At different points

during this proceeding, he has advanced a claim of actual innocence based on the results of a

polygraph examination that allegedly demonstrate his innocence of the charges against him. A

miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has

probably resulted in the conviction of one who is actually innocent,. . . ." Murray, 477 U.S. at

496, 106 S.Ct. 2639; see also Dixon v. Miller, 293 F.3d 74, 81 (2d Cir.2002). In this context, "

'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United

States*, 523 U.S. 614, 623-24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

Although Burch does not assert a formal stand-alone claim of actual innocence in his

habeas petition, he does refer to the allegedly favorable polygraph results at length. Thus, the

Court will consider the polygraph results as potential "new evidence of actual innocence," for

the sole purpose of determining whether Burch can fulfill the fundamental miscarriage of justice

exception.[14] Although a habeas petitioner is not bound by the rules of evidentiary admissibility in presenting alleged new evidence of actual innocence, he nevertheless must be able to establish that the evidence is "reliable," *Schlup v. Delo*, 513 U.S. at 324. Burch has not fulfilled this important prerequisite of the "actual innocence" exception to the procedural default rule; as the Supreme Court has pointed out, "[T]here is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *United States v. Scheffer*, 523 U.S. 303, 310-11 (1998) (citations omitted); *see also United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) (in which the Second Circuit noted that it had "not decided whether polygraphy has reached a sufficient state of reliability to be admissible"); *United States v. Duverge Perez*, 295 F.3d 249, 254 (2d Cir. 2002) (this court has expressly reserved judgment on issue of whether a sentencing court may admit polygraph results) (citing *Messina*, 131 F.3d at 42).

Accordingly, the claim regarding the trial court's improper charge to the jury is subject to an unexcused procedural default. Even if the Court were to consider it on the merits, it would not provide a basis for habeas relief. Essentially, petitioner's argument is that the trial judge unfairly marshaled the evidence regarding date of the occurrence by indicating that incident occurred "shortly after Valentine's Day, on or about February 14th or February 15th" in 1997. February 15, 1997, a Saturday, was the one day that the prosecutor focused on in cross-examining the victim's

---

[14]      In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court held that a claim of actual innocence may excuse a procedural bar and allow the court to consider the habeas petition's underlying claims. If the petitioner can show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," id. at 327, then Schlup provides a "gateway" to reach the merits of the otherwise procedurally-barred petition. Id. at 315-316; *accord Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceeding."). "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." 506 U.S. at 403.

mother and petitioner about their work schedules and who was babysitting for the children that day. The complainant's mother's personal diary which she created after the incident was reported, indicated that Burch worked from "9 to 10". She suggested, as did Burch, that he worked from 9 a.m. to 10 in the evening. However Burch's pay records indicate that he was only paid for one hour of work, that is, from 9 a.m. to 10 a.m. Burch also insisted that he *never* babysat the children by himself, although the theory of the defense was not that petitioner was never alone with the children. Burch's own claim on cross-examination not only was implausible, it also was undermined by other evidence. Although petitioner's brother supposedly babysat for part of the day on Saturday, he went to work at 5:30 p.m. Thus, there arguably was a time in the evening while the complainant's mother was still at work that Burch would have had to have been alone with the children on February 15, 1997. Habeas counsel basically is arguing that the trial court unfairly put the pieces of the puzzle together for the jury by specifically referring to a date on which Burch had the opportunity to commit the crime.

When faced with a claim of unfair marshaling of the evidence, a federal habeas court "must find the trial court's conduct to be substantially significant and substantially adverse to the defendant before it holds that the trial judge's conduct created an appearance of partiality which exceeded constitutional limitations." *Copeland v. Walker*, 258 F. Supp.2d 105, 138 (quoting *Jenkins v. Bara*, 663 F.Supp. 891, 898-99 (E.D.N.Y.1987) (citing *Johnson v. Scully*, 727 F.2d 222, 226 (2d Cir. 1984); *Daye*, 712 F.2d at 1570-71). Furthermore, for an erroneous state jury charge to result in a federal constitutional violation, the habeas petitioner has the burden of demonstrating that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp*

*v. Naughten*, 414 U.S. 141, 147 (1973)). It is not enough to show merely that the "instruction is undesirable, erroneous, or even 'universally condemned.'" *Id.* (quoting *Cupp*, 414 U.S. at 146).

In *Johnson v. Scully*, 727 F.2d at 226, for instance, the Second Circuit agreed with the district court that the manner in which the state trial judge marshaled the evidence demonstrated his clear bias in favor of the prosecution's case. The judge recounted the prosecutor's theory of the case at length, set forth the defendant's contentions only briefly (often accompanied by the answering contentions of the prosecution), and made several pointed adverse remarks that clearly expressed the judge's disbelief of the defendant's case. 727 F.2d at 226. The circuit court nonetheless reversed the district court's decision to grant the writ, concluding that the trial judge was not required to provide "equal time" to the defendant's case when marshaling the evidence presented, particularly where the majority of the testimony was presented by the prosecution, and that the trial judge's conduct did not exceed the bounds of constitutionality, even though "the trial judge could surely have found more neutral ways to set forth the prosecution and defense contentions." *Id.* at 227. Thus, courts in this Circuit have denied habeas relief in cases far more troublesome than this claim on these facts. *E.g.*, *Johnson v. Scully*, 727 F.2d at 226-27; *Minor*, 556 F. Supp. at 1386 (state trial court interjections were harmless error although "unfair to a degree that at least approached a due process violation").

Burch has not met the extremely high standard for demonstrating that any error in the trial court's charge violated some constitutionally guaranteed right so as to entitle him to habeas relief. *Cupp*, 414 U.S. at 146; *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985). It was, as the state has pointed out, clear from the testimony throughout trial, beginning with the victim's direct examination, that the incident allegedly occurred sometime around Valentine's Day of

1997. Also, the dates noted by the trial court were within the time frame alleged in the indictment. While it would have been better practice for the trial court to have the indictment verbatim, I do not believe that a due process violation has occurred here and habeas relief would not be warranted on this claim, were it properly exhausted.

**VI.     Conclusion**

For the reasons set forth above, petitioner Lawrence Burch's petition for a writ of habeas corpus is granted and his conviction in Chatauqua County Court for second degree (aggravated) sexual abuse is hereby vacated. Petitioner has already completed his sentence and is no longer in custody. Should the state choose to re-prosecute Burch, it must commence criminal proceedings agains him within sixty (60) days from entry of judgment.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
                    VICTOR E. BIANCHINI
                    United States Magistrate Judge

DATED:      August 14, 2009
                    Buffalo, New York.